GENERAL MOTORS CORPORATION, Appellant,

v.

Vernon BUCKNER, et al., and Division of Employment Security, Respondents.

No. ED 78853.

Missouri Court of Appeals, Eastern District, Division Two.

June 29, 2001.

Rosalee M. McNamara & Patrick M. Gavin, Kansas City, MO, for appellant.

Gerald Kretmar, Claytons, MO, Cynthia Ann Quetsch, Jefferson City, MO, for respondents.

CRANDALL, Judge.

Employer, General Motors Corporation, appeals from the decision of The Labor and Industrial Relations Commission, affirming the decision of the Division of Employment Security, which found that a one-time special payment to Vernon Buckner and other employees of General Motors Corporation did not make them ineligible for unemployment compensation benefits. We affirm.

Vernon Buckner and other employees (hereinafter employees) were members of United Automobile, Aerospace and Agricultural Implement Workers of America (hereinafter UAW) and were hourly production workers at the General Motors Corporation (hereinafter GM) plant located in Wentzville, Missouri. In June 1998, UAW members went on strike at two GM plants in Flint, Michigan. These plants produced parts necessary to GM's production nationwide. As a result of the strikes, production at GM's plant in Wentzville stopped. Between June 11, 1998, and August 3, 1998, employees were laid off due to lack of available work. The Flint strikes concluded on July 27, 1998, after GM and the UAW reached an agreement.

The terms and conditions of employment for the Wentzville hourly employees were governed by the national collective bargaining agreement (hereinafter national agreement) negotiated between GM and the UAW. Pursuant to the national agreement, the week in which Independence Day fell was designated as the Independence Week shutdown period. If an employee met specific prerequisites as set forth in the national agreement, the employee received 32 hours of Independence Week shutdown pay and 8 hours of holiday pay for Independence Day for that week. The criteria which the employee needed to meet to be entitled to this pay were (1)

have seniority; (2) be on the active rolls and otherwise scheduled to work; and (3) work the last scheduled day in the pay period prior to, and the next scheduled day after, the shutdown period. As a general rule, no production was performed that week.

As part of the settlement of the Flint strikes, on July 28, 1998, GM and the UAW entered into the following agreement:

## MEMORANDUM OF UNDERSTANDING ONE TIME SPECIAL PAYMENT

As a result of these negotiations and without prejudice to the position taken by either party, and without setting any precedent in the disposition of any other case involving similar circumstances, the parties agree to the following:

Employees who were on strike or layoff status at General Motors locations due to the labor dispute at the Flint Metal Center and Delphi E Flint East and who did not receive Independence Week Shutdown and Holiday Pay as a result of being on said layoff or strike and were otherwise entitled to these pay provisions as stipulated in the GM–UAW National Agreement, shall receive a one time special payment in the amount they would have been entitled to had they not been on strike or layoff.

This payment will be made in an expeditious manner and taxed as a regular wage payment in accordance with Document No. 81 of the GM–UAW National Agreement.

This payment shall initially be made by General Motors. Thereafter, payments otherwise required by Paragraph III.A of the Memorandum of Understanding Joint Activities, 1996 GM–UAW National Agreement, shall be waived until General Motors is reimbursed for the total amount paid to employees as a result of this Memorandum.

Further, the parties recognize that these payments may result in employees being ineligible for unemployment compensation already received. Employees impacted by such overpayment of unemployment compensation will be responsible to repay the State that provided the unemployment compensation.

(Hereinafter memorandum). As a result of the memorandum, employees received the one-time special payment (hereinafter special payment) in the form of a check on August 13 or 14, 1998. The special payment was included in the check with the regular earnings for the pay period ending August 9, 1998; and was taxed as wages. The check was for a total of 40 hours of pay at the regular rate of pay; and the check stub designated two payments as "miscellaneous," one for 32 hours and the other for 8 hours. At the request of the UAW, union dues for July were withheld from the special payment for 65,000 employees; although such dues were eventually refunded to 55,000 of those employees.

During the layoff period for the Wentzville plant, employees applied for and received unemployment compensation from the Missouri Division of Employment Security. After the strikes were resolved, GM took the position that employees were not entitled to unemployment compensation for the week of June 28 through July 4, 1998, because they had been paid for that week in the form of the special payment. The Missouri Division of Employment Security deputies determined that under the employment security law the special payment constituted wages for the week ending July 4, 1998, with the result that employees were employed during that week and were not eligible for unemployment compensation benefits. Employees appealed to the Appeals Tribunal. The

Appeals Tribunal reversed, concluding that the special payment did not constitute wages under the employment security law; and that if the payment were considered wages, the agreement was struck more than three weeks after July 4, 1998, such that the special payment was not payable with respect to the week ending July 4, 1998. The Labor and Industrial Relations Commission (hereinafter Commission) affirmed the decision of the Appeals Tribunal, adopting its decision.[1] GM appeals from that decision.

Because we find that Point II is dispositive of this appeal, we address that point alone. GM challenges the Commission's finding that employees were eligible for, and not overpaid, unemployment compensation benefits for the week of June 28 through July 4, 1998. GM asserts that the special payment was payable for the week ending July 4, 1998, the week to which the special payment was allocated, and not payable for pay period ending August 9, 1998, for which it was actually paid.

■ The purpose of the employment security law is to provide benefits to persons unemployed through no fault of their own. *Kelley v. Manor Grove, Inc.,* 936 S.W.2d 874, 876 (Mo.App. E.D.1997). Section 288.020.2, RSMo (2000) provides that "[t]his law shall be liberally construed to accomplish its purpose to promote employment security both by increasing opportunities for jobs through the maintenance of a system of public employment offices and by providing for the payment of compensation to individuals in respect to their unemployment."

■ An individual shall be deemed totally unemployed "in any week during which the individual performs no services and *with respect to which no wages are*

*payable* to such individual." Section 288.030.1(26)(a), RSMo (2000) (emphasis added). Under section 288.036 .1, RSMo (2000), wages are defined as follows, in relevant part:

> [A]ll remuneration, *payable or paid,* for personal services including commissions and bonuses and ... the cash value of all remuneration paid in any medium other than cash.... Vacation pay and holiday pay shall be considered as wages for the week *with respect to which it is payable.*

(Emphases added). The purpose of the employment security law is to provide a minimal basic support to wage earners whose wages have been terminated or been sharply reduced because of unemployment. *Swafford v. Industrial Comm'n,* 462 S.W.2d 147, 152 (Mo.App. 1970). Unemployment compensation is not intended to provide supplemental income to non-working persons who continue to receive their full wages under some other appellation. *Id.*

Assuming, without deciding, that the special payment constituted wages under the employment security law, the only issue is the timing of the special payment. If the special payment was attributed to the week ending July 4, 1998, the special payment was deductible from employees' unemployment compensation benefits for that week. If, however, the special payment was allocated to the pay period ending August 9, 1998, for which the special payment was actually made, the employees were back to work at that time and did not receive unemployment compensation benefits from which to deduct the special payment. The question of whether the special payment was attributable to a week in which employees received unemployment

---

1. One member of the Commission dissented on the grounds that the special payment qualified as wages and was allocated to the week of June 28 to July 4, 1998.

compensation benefits was a question of fact for the Commission's resolution. *See, e.g., Hadlock v. Oklahoma Employment Sec. Comm'n,* 23 P.3d 300 (Okla.Civ.App. 2000); *Kitchen v. Employment Sec. Bd. of Review,* 27 Kan.App.2d 775, 9 P.3d 575, 584 (2000).

▆▆▆▆ Section 288.210, RSMo (2000) governs appellate review of decisions of the Commission. On appeal, we may modify, reverse, remand for rehearing, or set aside the decision of the Commission on the following grounds and no other:

(1) That the commission acted without or in excess of its powers;

(2) That the decision was procured by fraud;

(3) That the facts found by the commission do not support the award; or

(4) That there is no sufficient competent evidence in the record to warrant the making of the award.

Section 288.210. The Commission's factual findings, if supported by competent and substantial evidence, in the absence of fraud, shall be conclusive; and our review shall be confined to questions of law. *Fin–Clair Corp. v. Lashea,* 30 S.W.3d 237, 240 (Mo.App. E.D.2000). The evidence and all reasonable inferences drawn therefrom is viewed in the light most favorable to the findings of the Commission. *Id.* On appeal, we determine whether the Commission, based on the whole record, reasonably could have made its findings and reached its result. *Id.* If the evidence would reasonably support two different results, this court must accept the one reached by the Commission. *Howard v. Labor and Indus. Relations Comm'n,* 671 S.W.2d 826, 827 (Mo.App.1984).

▆▆▆▆ Section 288.030.1(26)(a) references unemployment to a point in time because a person is deemed unemployed in any week "with respect to which no wages are pay-able." When section 288.036 defines wages, it references wages to a point in time by using the language "payable" when it refers to remuneration and "with respect to which it is payable" when it refers to holiday and vacation pay. Although the employment security law does not define "payable," Black's Law Dictionary 1128 (6th ed.1990) defines the term "payable" as follows: "Capable of being paid; ... justly due; legally enforceable. A sum of money is said to be payable when a person is under an obligation to pay it." The term "payable," as used in the context of wages to determine eligibility for unemployment compensation benefits, requires some legal obligation on the part of the employer to compensate employees.

In *Swafford,* 462 S.W.2d at 152, this court determined that the employee was in the employ of the employer on January 29, 1968, the date that he received so-called "bereavement pay." The court reasoned that the employee was exercising his rights pursuant to a collective bargaining agreement to be absent from work to attend his mother-in-law's funeral and to be paid in full. *Id.* Thus, the employee had a legal right to obtain "bereavement pay" on the basis that the compensation was due him for that day. Although the holding in *Swafford* was that "bereavement pay" constituted wages, the date the employee received "bereavement pay" was relevant to determine if the employee received wages on a particular day. Because the "bereavement pay" was "payable" on January 29, 1968, the employee was employed on that date for purposes of determining his eligibility for unemployment compensation benefits.

In *Labor and Indus. Relations Comm'n v. Division of Employment Security,* 856 S.W.2d 376 (Mo.App. E.D.1993), the court determined that payments under the Worker Adjustment and Retaining Notifi-

cation Act, 29 U.S.C. sections 2101–2109 (1988) (hereinafter WARN) were wages. But, the timing of the WARN payments was also relevant. The WARN Act required the employer to give the employees 60 days' written notice before a plant closing or pay them for that period. *Id.* at 377. The employer was legally obligated to comply with the notice provisions and to keep the employees on the payroll for 60 days after notifying them of a plant closing or else face civil liability. *Id.* at 380. The employees were legally entitled to the WARN payments for a specific 60 day period. The WARN payments therefore were "payable," because they were legally due for 60 days after notice; and were properly deductible from the employees' unemployment compensation benefits for that designated period of time.

■ In the instant action, however, the special payment was not "payable" to employees for the week ending July 4, 1998, because employees had no legal right to the special payment at that time. At the time of the layoffs, there was no showing that employees had an expectation of any type of payment during the layoff period caused by the Flint strikes. There was no showing that, absent GM's agreement to pay employees the special payment in the memorandum, employees would have had a legal right to obtain the special payment on the basis that the compensation was due them. There was no provision in the national agreement between the UAW and GM that would have compelled a finding that the special payment was due employees, absent GM's agreement in the memorandum. In fact, employees were not strictly entitled to the special payment under the national agreement, because they were on layoff and did not work the requisite days before and after the Independence Day shutdown. Thus, the special payment was not "payable" for the week

ending July 4, 1998. The special payment became payable on August 9, 1998, the pay period with respect to which GM allocated it; and the payment was receivable in the week of August 13 or 14, 1998, when it was actually paid.

On appeal, GM characterizes the special payment as Independence Week shutdown pay and holiday pay for Independence Day for the week of June 28 through July 4, 1998. Yet, the Commission found that "the only connection between the [special] payment and the week ending July 4, 1998, is the fact that the payment was computed based on the same formula used to compute shutdown/holiday pay." The memorandum merely stated that employees "who were on layoff or strike . . . and who did not receive Independence Week Shutdown and Holiday Pay as a result of being on said layoff or strike and were otherwise entitled to these pay provisions as stipulated in the GM–UAW National Agreement, shall receive a one time special payment *in the amount they would have been entitled to* had they not been on strike or layoff." (Emphasis added). Thus, qualified employees were entitled to a special payment equal in amount to the pay they would have received for the week ending July 4, 1998, had they not been on layoff. The memorandum did not, however, specify that the special payment was for the week ending July 4, 1998, and did not label the special payment Independence Week shutdown pay and holiday pay for Independence Day. The paycheck, received around August 14 or 15, 1998, reflected that the pay was for the pay period ending August 9, 1998, and included employees' regular pay as well as the special payment. The paycheck did not designate the special payment as shutdown and holiday pay for the week ending July 4, 1998, but listed the special payment as "miscellaneous."

GM relies on *Globe–Democrat Pub. Co. v. Indus. Comm'n,* 301 S.W.2d 846 (Mo. App.1957), for the proposition that the time when the special payment was actually received is irrelevant. In that case, this court held that a dismissal payment received by a discharged employee equivalent to 24 weeks' pay as required under a collective bargaining agreement rendered the employee ineligible for compensation for the 24 weeks immediately following termination of his employment. *Id.* at 852. That decision, however, is not controlling. First, section 288.040 in effect at that time expressly stated that the employee was ineligible for unemployment compensation benefits for any week for which he received remuneration in the form of "termination allowances." Second, under the collective bargaining agreement with the employer, the employee was entitled to severance pay constituting remuneration for a period of time following termination from service. In comparison, the special payment at issue here did not by statute reduce unemployment compensation and did not constitute a payment to which employees were legally entitled by virtue of their collective bargaining agreement.

Other jurisdictions have addressed the issue of the timing of the special payment paid to GM employees, reaching different results as to the deductibility of the special payment from unemployment compensation benefits. *Hadlock,* 23 P.3d at 300 (affirmed Board of Review's decision that the special payment was made with respect to the week ending July 4, 1998, and was deductible from unemployment compensation benefits for that week); *Kitchen,* 9 P.3d at 575 (affirmed Board's decision that under Kansas statutes the controlling factor for deductibility from unemployment compensation benefits was not the date of the special payment, but the week to which the special payment was allocat-ed); *but see Aaron v. Review Bd. of Indiana Dept. of Workforce Dev.,* 726 N.E.2d 880 (Ind.App.2000) (reversed Review Board's decision and held that the state statutes required finding that the special payment was deductible from unemployment compensation benefits not for the week ending July 4, 1998, but when actually made in August 1998). We are not compelled, however, to follow decisions from other jurisdictions. Due to the fact that the types of statutes involved in the various states are not uniform but frequently divergent, we do not consider authorities from other jurisdictions decisive of this matter. *Western Elec. Co. v. Indus. Comm'n,* 489 S.W.2d 475, 482 (Mo. App.1972). Rather, we interpret our own statutes to determine whether the special payment was deductible from unemployment compensation payments. In addition, the appellate courts in both *Hadlock* and *Kitchen* reiterated that the determination of whether wages were paid or payable for a particular week was a factual determination; and affirmed their respective boards, because their scope of review required judicial deference to the boards' decisions. *Hadlock,* 23 P.3d at 301–302; *Kitchen,* 9 P.3d at 584–585. We, too, defer to our Commission's decision regarding the week with respect to which the special payment was deemed payable.

GM also contends that the memorandum informed employees that the special payment would be deductible from unemployment compensation benefits for the week ending July 4, 1998. We disagree. The memorandum stated that the special payment "may result" in ineligibility for unemployment benefits received for that week. The language of the memorandum did not evince any agreement by GM and the UAW as to when, or whether, the special payment would be deducted from unemployment compensation benefits.

GM further argues that the purpose of unemployment compensation does not allow employees a double recovery; namely, the special payment from GM and the payment of unemployment compensation benefits at the same time. GM, however, did not make the special payment at the time the Independence Day shutdown and holiday pay were normally due. The Missouri unemployment security law recognizes that employees may receive payments at a time different from when they would have been due and provides that wages are deductible from unemployment when they are "paid" or "payable." Sections 288.030 and 288.036. As discussed above, the special payment was not "payable" for the week ending July 4, 1998; and there was no windfall in the form of double recovery by employees for that week.

We conclude that the Commission's findings that the special payment was not payable with respect to the week ending July 4, 1998, and that employees were unemployed for that week are supported by competent and substantial evidence. We further agree with the Commission's conclusion that employees were eligible for unemployment compensation benefits for that week. Accordingly, we affirm the decision of the Commission.

CLIFFORD H. AHRENS, Presiding Judge and JAMES R. DOWD, Judge: concur.