

# SUPREME COURT OF MISSOURI
## en banc

MELISSA CODAY,                          )
                                        )
                    Appellant,          )
                                        )
        v.                              )        No. SC93361
                                        )
DIVISION OF EMPLOYMENT SECURITY,        )
                                        )
                    Respondent.         )

APPEAL FROM
THE LABOR AND INDUSTRIAL RELATIONS COMMISSION

*Opinion issued February 25, 2014*

Claimant Melissa Coday received $320 in unemployment benefits and $25 in federal stimulus benefits for each of the 48 weeks from May 9, 2009, to March 6, 2010, and $320 in "waiting week" benefits for the week of March 13, 2010.  The Labor and Industrial Relations Commission ("the Commission") subsequently found that she willfully failed to disclose that she was working during this period and, therefore, that she must return part of her benefits and pay certain penalties.  This Court granted transfer pursuant to Rule 83.04 and has jurisdiction over the appeal.  *See* Mo. Const. art. V, § 10.  Finding sufficient competent evidence in the record for all of the Commission's actions, except for the amount of one of the penalties, the Court remands with instructions to reassess that penalty.  The Commission's decisions are affirmed in all other respects.

*I. Facts*

Coday worked at Sullivan Private Label Company for 20 years before the financial crisis in 2008 threatened her compensation and job security. In anticipation of a reduced salary, Coday began working part-time for Design Design, a wholesale supplier of holiday and other print goods, in July 2008. Coday continued working for Design Design after she was laid off from Sullivan in May 2009 and up until she again obtained full-time employment in March 2010. On average, she worked 10 to 15 hours a week, receiving orders from retail customers and submitting them to Design Design. Most of her work was done from home, but occasionally she visited customers to deliver catalogues, show new merchandise, and take orders.

For her services, Design Design paid Coday 14 percent of the orders paid for by customers in her area, regardless of whether Coday placed the order or the customer ordered directly from Design Design. Coday was not paid for any order, however, until the order was shipped and paid for. Because Design Design offered extended payment terms to certain customers, it could be several months before Coday was paid for some orders. As she worked, Coday knew the time she spent soliciting or relaying orders, the value of each order, and her expected compensation, but she did not know when and whether an entire order would ship, or when and whether that customer would pay in full. On or about the 20th of each month, Design Design would direct deposit Coday's compensation based on orders for which it had received payment during the preceding month and would specify the orders for which Coday was being paid. Coday did not maintain records of her hours or the basis for compensation expected or received, nor did

she submit any such evidence from Design Design.  As a result, Coday's own statements about her work and Design Design's records of her monthly gross pay were the only evidence in the record of her employment and earnings during this period.

Even though she was working for and being paid by Design Design, Coday filed weekly claims for unemployment benefits with the Division of Employment Security ("Division") from May 2009 to March 2010.  The Division's online system, through which Coday filed most of her claims, prompted her each week with the yes-or-no question: "Did you do any work this week?"  Coday claims she initially sought guidance from the Division by phone and in person, but, having failed to reach anyone who could answer her questions, Coday admits that she answered "no" to that question each week.  Consequently, she was not prompted for—and did not provide—her earnings information.

Several months after Coday had stopped claiming benefits, the Division conducted a routine audit and discovered Coday's employment with Design Design.  Following this discovery, the Division issued five rulings pursuant to section 288.380.[1]  First, the Division determined that Coday willfully failed to disclose earnings and other facts material to her claims from May 3 to October 3, 2009, which resulted in her being overpaid benefits during that period ("Overpayment I").  As directed by the statute, the Division also assessed a penalty in the amount of 25 percent of the overpaid benefits ("Penalty I").  The Division later determined that Coday willfully failed to disclose earnings and other facts, resulting in an overpayment of benefits for the period from

[1]   Unless otherwise noted, the statutes cited herein are found in RSMo Supp 2013.

3

October 4, 2009, to March 6, 2010 ("Overpayment II"), and imposed a penalty for that period ("Penalty II"). Citing Overpayment I and Penalty I as "a prior fraud overpayment," however, the Division assessed Penalty II in the amount of 100 percent (rather than 25 percent) of Overpayment II. Finally, the Division determined that Coday had been overpaid benefits for the week of March 13, 2010, her "waiting week" ("Waiting Week Overpayment").[2]

Ultimately, the Division's Appeals Tribunal and the Commission reviewed and upheld each of the Division's determinations.[3] Coday appealed the Commission's five decisions under section 288.210, RSMo 2000.

## II. Standard of review

Courts review agency decisions to determine whether they are "supported by competent and substantial evidence upon the whole record." Mo. Const. art. V, § 18; *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 222-23 (Mo. banc 2003). If supported by such evidence (and in the absence of fraud), the Commission's findings of fact are conclusive, "the jurisdiction of the appellate court shall be confined to questions of law," and the court may modify, reverse, remand for rehearing, or set aside the Commission's decision "on the following grounds and no other:"

---

[2]   Due to the time it takes to process claims, employment security claimants often do not start receiving benefits until one week after becoming eligible. As in this case, benefits for this "waiting week" are typically paid one week after the claimant has ceased claiming benefits.

[3]   The Appeals Tribunal and the Commission modified the amounts of Overpayment I and Penalty I to account for weeks in which Coday's earnings did not exceed her eligibility for benefits. The Appeals Tribunal dismissed Coday's appeals from Overpayment II and Waiting Week Overpayment as untimely, and the Commission affirmed.

(1) That the commission acted without or in excess of its powers;
(2) That the decision was procured by fraud;
(3) That the facts found by the commission do not support the award; or
(4) That there was no sufficient competent evidence in the record to warrant the making of the award.

§ 288.210.

## III. Analysis

Coday argues that no competent and substantial evidence supports the Commission's decisions. Coday challenges the substance of the Division's findings that her violations were willful, its method of prorating her monthly wages, and its imposition of penalties. Coday also contends that the Division erred procedurally by determining Overpayment II, Penalty II and the Waiting Week Overpayment more than a year after her benefit year had ended, and that the Commission erred by denying her appeals of those determinations as untimely. Lastly, Coday contests the Commission's ruling that she was ineligible for waiting week benefits because that decision was predicated on the errors alleged above. Except for her objection to the amount of Penalty II, the Court rejects each of Coday's arguments.

### A. Coday fraudulently and willfully failed to disclose facts material to her claims

The Commission's decision that Coday intentionally misreported to the Division and willfully failed to disclose earnings and other facts material to her claims was supported by competent and substantial evidence.[4] Findings of intentional

---

[4] The Commission made explicit findings with respect to Overpayment I and Penalty I. The Commission did not reach the merits of the Waiting Week Overpayment and Overpayment II because it determined that Coday's appeals from them were untimely. The parties agree,

5

misrepresentation and willfulness are governed by section 288.380, which provides, in

pertinent part:

> 9. (1) Any individual or employer who receives or denies unemployment benefits by intentionally misrepresenting, misstating, or failing to disclose any material fact has committed fraud. After the discovery of facts indicating fraud, a deputy shall make a written determination that the individual obtained or denied unemployment benefits by fraud and that the individual must promptly repay the unemployment benefits to the fund.
>
> [….]
>
> 10. An individual who willfully fails to disclose amounts earned during any week with respect to which benefits are claimed by him or her, willfully fails to disclose or has falsified as to any fact which would have disqualified him or her or rendered him or her ineligible for benefits during such week, or willfully fails to disclose a material fact or makes a false statement or representation in order to obtain or increase any benefit pursuant to this chapter shall forfeit all of his or her benefit rights [….]

§ 288.380. Coday maintains that she could not have acted fraudulently or willfully

because she lacked the specific intent to obtain benefits in violation of the law[5] and that

---

however, that the merits of Overpayment II and Penalty II are identical to those at issue in Overpayment I and Penalty I. Therefore, Coday's challenges to the Commission's finding of willfulness, its proration of her earnings, and its imposition of penalties also are applicable to Overpayment II and Penalty II. Ultimately, the timeliness of her appeals from the latter determination is relevant only if Coday's challenges are meritorious. Because they are not, this Court does not reach that question.

[5] As discussed below, many of Coday's procedural objections turn on a supposed distinction between subsections 9 and 10 of section 288.380. In her substantive challenge, however, Coday does not differentiate between "intentionally" and "willfully" failing to disclose facts material to her claims. The Division and Commission likewise make no distinction, finding that Coday "intentionally misreported to the Division" and "willfully failed to disclose earnings and facts." The Court, therefore, assumes, both here and as relevant below, that there is no substantive difference between a finding that Coday "intentionally" failed to disclose material facts under subsection 9, thereby committing fraud, and that she "willfully" failed to do so under subsection 10, thus forfeiting benefit rights. This approach also is supported by the reference in section 288.070 to a finding that a claimant "willfully failed to disclose or falsified any fact" relevant to her claims "as contemplated in subsection 9 of section 288.380." Section 288.070.8, RSMo.

6

she reasonably was ignorant of the proper manner to report her hours and earnings to the Division.

First, Coday misstates the meaning of "willfulness" under section 288.380. "Willfulness" generally does not require a specific intent to break the law. Instead, it requires only that a person intend the consequences of his or her acts or act with a wrongful purpose. In the civil context applicable here, "willfulness" suggests only that an action is voluntary or intentional, rather than inadvertent or accidental. Coday's claim that she lacked the specific intent to obtain benefits unlawfully, therefore, is irrelevant. What matters is that she intended to and did obtain benefits by voluntarily, consciously, or intentionally failing to disclose her work for (and earnings from) Design Design.

Coday's invocation of *Welsh v. Mentor Mgmt., Inc.*, 357 S.W.3d 277 (Mo. App. 2012), and *Tenge v. Washington Grp. Int'l, Inc.*, 333 S.W.3d 492 (Mo. App. 2011) likewise is misplaced. Those cases involved determinations of work-related misconduct barring benefits under section 288.050.2, which may be "an act of wanton or willful disregard of the employer's interest" or "negligence in such degree or recurrence as to manifest culpability, wrongful intent or evil design." § 288.030.1(23). This standard is notably narrower than the standard for willfulness under section 288.380, and that is the way it must be; most incidents of workplace misconduct bear a remote relationship, if any, to the unemployment benefits system, and the Division is poorly situated to police them. Misrepresentations to the Division in the course of claiming unemployment

benefits, however, directly affect its ability to function properly and, by definition, occur in the course of a claimant's transactions with it.[6]

Coday also errs in suggesting that her ignorance of the precise manner for properly reporting her Design Design earnings precludes a finding of willfulness. Coday did not report her earnings incorrectly; she failed to report them at all. More pointedly, Coday's misrepresentations were fraudulent not merely because she reported no earnings, but because she also reported no **work**. Coday never faced the question of how much she earned while claiming benefits because, for 49 straight weeks, she told the Division she was not working. Coday **was** working, she knew she was working, and she knew that her statement to the contrary was wrong and misleading.

What is more, Coday understood that her answers regarding work and earnings would affect her eligibility for benefits, and she intended to protect her eligibility by giving untrue answers. She conceded that "it would've been more accurate to report in the weeks where I actually was paid." She also stated:

> I felt that if I did report earnings that week it would create [a] snafu within the system, and then perhaps, even though I was only being paid for that week, I would be denied benefits for every other week. [….] I felt like if I reported earnings for that week, that might somehow indicate that I had a job, and my benefits would stop, and completely, even though I wasn't being paid on any of the other weeks of the month [….]

---

[6] Indeed, the final sentence of subsection 10 provides: "It shall be presumed that [a] failure or falsification was willful in any case in which an individual signs and certifies a claim for benefits and fails to disclose or falsifies as to any fact relative to such claim." Neither party argues that this presumption applies to Coday's claims, which were submitted by phone and online, but it nevertheless evinces a broad legislative intent wholly unlike the narrow "misconduct" standard in section 288.030.

Therefore, Coday accurately understood the consequences of reporting work and wages.

Wages reduce benefits when earned, regardless of when they are paid. *See* § 288.036.1.

Therefore, Coday's monthly payments would have affected her eligibility for benefits in

any week in which she worked. These payments indicated correctly that she had a job

and, because they exceeded her earning allowance, they reduced her benefits.

Accordingly, Coday's actions were willful under any definition, and the Commission's

findings of fraud and willfulness were supported by competent and substantial evidence.

### B. The Waiting Week Overpayment, Overpayment II, and Penalty II were within the Division's authority and supported by competent and substantial evidence

The Division's Waiting Week Overpayment,[7] Overpayment II, and Penalty II

determinations were made in the fall of 2011, more than 12 months after Coday's benefit

year ended on May 3, 2010. Coday asserts that the Division was without authority to

make these assessments, citing section 288.070.5:

> The deputy may, however, not later than one year following the end of a
> benefit year, for good cause, reconsider any determination on any claim and
> shall promptly notify the claimant and other interested parties of such
> deputy's redetermination and the reasons therefor.

Section 288.070.5.

Section 288.070.5 governs determinations of initial claims, however, and does not

control or limit section 288.380. The 2011 determinations, and the decisions of the

Appeals Tribunal and Commission upholding them, clearly and repeatedly indicate that

---

[7]  Both parties agree that Coday's challenge to the Waiting Week Overpayment turns on whether she was overpaid benefits prior to receiving her waiting week payment. Because Coday had received benefits fraudulently, she was overpaid benefits, appropriately penalized, and properly determined to be ineligible for waiting week benefits.

9

they were made pursuant to section 288.380, for which there is no one-year time limit. The Waiting Week Overpayment and Overpayment II determinations cite and quote section 288.380 at length in their "Appeal Rights and Repayment Information" portions, and the latter invokes that section in its finding that Coday "willfully failed to disclose amounts earned" or other facts material to her claims. Each document is titled a "determination," as described in section 288.380.9, not a "redetermination" referred to in 288.070.5. Neither cites section 288.070, nor does that section make any reference to willfulness findings except "as contemplated in subsection 9 of section 288.380." Section 288.070.8. Accordingly, this Court finds that the Waiting Week Overpayment, Overpayment II and Penalty II were written determinations pursuant to 288.380 and, therefore, not subject to the one-year limitation of section 288.070.5.

### C. *The calculation of overpayments was supported by competent and substantial evidence*

Having properly found that Coday fraudulently and willfully failed to disclose facts rendering her partially ineligible for benefits, the Division faced the task of calculating the amount of benefits that Coday obtained by fraud and, therefore, must "promptly repay […] to the fund." § 288.380. Calculating this overpayment required subtracting Coday's earnings from the benefits she had received for each week she filed a claim. The Division's witness testified that:

> [T]he Division tries to get back with an employer if they report a monthly or bi-weekly kind of payroll to see if, based on time cards or work records, or something like that, that they can provide a more accurate day-to-day record, because claimants […] claim benefits on a weekly basis. So the Division would prefer, obviously, to break it down to a weekly basis if at

10

all possible, but some employers simply do not maintain those type of records.

Coday, too, claims that she did not keep records of her days or hours worked, orders entered, or compensation expected and, as a result, that there is no evidence of how much (if at all) she worked during each week from May 2009 to March 2010 or for which weeks her monthly compensation was paid. Because the Commission cannot prove anything else, she claims that her wages should be deemed to reflect work done only in the weeks in which she actually received them.

This argument ignores the fact that "the burden of proof to establish a claimant's right to benefits under the Unemployment Compensation Law rests upon the claimant" and "never shifts during the course of the trial." *Haynes v. Unemployment Comp. Comm'n*, 183 S.W.2d 77, 80 (Mo. 1944). *See also Producers Produce Co. v. Indus. Comm'n of Mo.*, 291 S.W.2d 166, 173 (Mo. banc 1956). Coday cannot rely on the absence of evidence establishing precisely when she worked to prove that she was eligible for benefits—especially when it was within her exclusive power to produce such evidence. Coday admits that she was working for Design Design throughout the time she was claiming benefits. She admits that she was paid monthly for her work and that her monthly compensation related to work performed in previous months.[8] Furthermore, although orders in Coday's sales area provided the *basis* for her compensation, Coday

---

[8] Coday asserts that the regular payments on the 20th of each month were not related to orders that she submitted in the previous month but likely were related to orders placed in months prior to that. The Division could have prorated Coday's wages across the entire benefit period, which would have tended to increase her total overpayment. Because such a method would be difficult to administer month by month, however, the Division reasonably decided to give Coday the benefit of applying each month's payment only to the preceding month.

11

was paid for performing all of her duties for Design Design, including customer visits and unsuccessful solicitations. To find that she was working (and earning) only in the weeks that she actually received a paycheck solely because she failed to record when she actually worked would pervert the incentives of both claimants and employers, discouraging precise record-keeping and encouraging irregular payment schemes.

There was some evidence here, however, and it is adequate to support the Commission's decision. It is undisputed that Coday worked for Design Design starting in July 2008 and throughout the period for which she claimed benefits. Coday admits that she was working during the weeks she claimed benefits and that she worked, on average, 10 to 15 hours per week. When trying to explain the irregularity of her work, Coday stated that she "could go sometimes two, three, four, five days without an order" and that she performed many tasks that did not result in an immediate order. Coday does not claim that she ever went an entire week without working or that she worked substantially more during some weeks than others. Indeed, while describing in detail the seasonal fluctuations in some customers' *payments* to Design Design, Coday did not claim that *her work* fluctuated seasonally, and she readily provided a weekly average of hours when asked. Accordingly, the evidence of record supports the Commission's decision to allocate each month's paycheck to each of the weeks in the preceding month.

Moreover, Coday's contention that each month's paycheck must be allocated entirely to the week in which it was received is refuted by her own statement that "there was absolutely no evidence that the Design Design commissions were earned the week they were paid, or were related in any sense to work done that week." Her method of

calculation suffers from the same defects she ascribes to the Division's calculations. To escape this contradiction, Coday maintains that her situation is so "unusual" as to defy normal treatment.[9] But Coday's compensation arrangement was not as unique as she claims. Even if her compensation is characterized properly as commission, such compensation is included in the definition of wages. § 288.036.1. The Division's witness testified that situations like Coday's were "not uncommon at all" and that the Division uses a routine practice for such cases:

> [W]hen people are paid on commission [and] simply do not know what the commissions are going to be--the instruction to those people are report, obviously, that you were working because you are, so report yes. If you don't know the amount of the commissions, figure it as best you can, and when in doubt, over report it [...] and then if you didn't make quite as much as you reported, call us and we'll adjust it, and pay you any additional benefits that you may be due.

Coday testified that her commissions were 14 percent of shipped sales and that she could have approximated them at the time of the orders, subject to adjustment when paid,

---

[9]  To complete this argument, Coday also must assert that her method of calculation is preferable to the Division's and, to that end, cites *Gen. Motors Corp. v. Vernon Buckner*, 49 S.W.3d 753 (Mo. App. 2001). *Buckner* does not help Coday. There, the court of appeals held that a 1998 "One Time Special Payment" from GM to certain union members, promised by contract on July 28 and included with regular earnings for August 9 in checks cut August 13 and 14, was not "payable" on July 4, notwithstanding contrary provisions of the contract. Simply put, the wages could not have been payable before they were promised because wages are "payable" only if there is "some legal obligation on the part of the employer to compensate employees." *Buckner*, 49 S.W.3d at 757. Here, Coday does not suggest that Design Design was not legally obligated to pay her for the work she did for them; only that she could not, at the time of the hearing, retrace when precisely each obligation arose and that keeping track of her earnings in the first place "would've been very complicated." Furthermore, the court in *Buckner* expressly held that the special payment in that case became payable on August 9, 1998 (the pay period for which it was allocated), and *not* on August 13 or 14, when payment was actually made. *Buckner*, 49 S.W.3d at 758. It is undisputed that each of Design Design's monthly payments was allocated as wages for the preceding month. Accordingly, each was payable and properly deducted from benefits received that month.

but she did not.[10] Thus, the only distinction between her and what the Division described as "dozens, maybe hundreds of people" in "the exact same situation" is that she did not keep records of her hours, sales, or earnings and failed to report any work or earnings on her benefits claims. Accordingly, competent and substantial evidence supports the Commission's decision affirming the Division's method of prorating Coday's wages for each of the weeks she worked. Any imprecision or inaccuracy in that method was Coday's own fault, not the Division's fault.

### D. Coday's willful misrepresentations warranted fraud penalties

#### 1. Coday was liable for the 25 percent penalty assessed in Penalty I

On May 2, 2011, the Division assessed Penalty I in the amount of 25 percent of Overpayment I. As discussed above, Coday fraudulently and willfully failed to disclose her earnings and other facts material to her claims for benefits and, therefore, received unemployment benefits by intentionally misrepresenting, misstating, or failing to disclose those facts. Section 288.380.9(1) provides that upon discovery of facts indicating such fraud:

> [T]he deputy shall assess a penalty equal to twenty-five percent of the amount fraudulently obtained or denied. If division records indicate that the individual or employer had a prior established overpayment or record of denial due to fraud, the deputy shall, on the present overpayment or determination, assess a penalty equal to one hundred percent of the amount fraudulently obtained.

§ 288.380.9(1). Penalty I was fully authorized by this statute.

---

[10] Coday's testimony also indicates that her monthly paychecks were indexed by order number, such that she could have determined any over-reported commissions had she kept records.

### 2. Coday was not liable for the 100 percent penalty assessed in Penalty II

On December 8, 2011, the Division assessed a penalty in the amount of 100 percent of Overpayment II. Even though section 288.380.9(1) requires such a penalty if there is a "prior established overpayment or record of denial due to fraud," neither the Division nor the Commission offered any explanation for treating Coday's series of fraudulent claims as two distinct violations so that Overpayment I could be used to increase Penalty II to 100 percent. Section 288.380.9 provides that the deputy "shall" assess the higher penalty only where the claimant "had" a prior record of fraud. The use of the past participle "had" for the claimant, in contrast to the present-tense "shall" for the deputy, suggests that the enhanced penalty is proper only where the prior fraud had been established before the subsequent fraud was committed. It may be that there are circumstances in which early conduct within a continuous and consecutive series of claims can constitute prior established fraud for the purposes of enhancing the penalty imposed on later conduct in the same series. But where all fraudulent conduct took place before any overpayment or penalty was assessed, the Division exceeded its authority by splitting the claims arbitrarily into two periods and using the first to justify a 100 percent penalty on the second.

### IV. Conclusion

For the reasons set forth above, the Court finds no error in the Commission's decisions other than the calculation of Penalty II relating to the overpayment of Coday's benefits between October 4, 2009, and March 6, 2010. Accordingly, the

15

Commission's decisions are vacated and remanded with instructions that Penalty II be assessed at a rate of 25 percent, not 100 percent, and that the Commission otherwise continue these decisions in all other respects..


_____

Paul C. Wilson, Judge




All concur.