

# In the Missouri Court of Appeals
# Eastern District

## DIVISION TWO

| | | |
|---|---|---|
| DANNY HARRIS, | ) | No. ED107606 |
| | ) | |
| Appellant, | ) | Labor and Industrial Relations |
| | ) | Commission |
| vs. | ) | |
| | ) | |
| RALLS COUNTY, MISSOURI, | ) | |
| | ) | |
| Respondent. | ) | Filed:  October 1, 2019 |

### Introduction

Danny Harris ("Claimant") appeals the Labor and Industrial Relations Commission's (the "Commission") decision modifying the decision of the Administrative Law Judge ("ALJ").  The ALJ awarded Claimant permanent total disability and future medical benefits because a work-related accident was the prevailing factor in causing him to suffer injuries to his low back.  In modifying the ALJ's decision, the Commission determined Claimant was not permanently and totally disabled and instead found the work-related accident was the prevailing factor in causing him to suffer a chronic back sprain or strain.  Therefore, the Commission concluded Claimant suffered only five percent permanent partial disability.  The Commission also determined Claimant was not entitled to future medical benefits.

On appeal, Claimant argues the Commission erred in modifying the ALJ's award because in doing so: it misstated the record and disregarded the findings of Claimant's employer-

authorized treating physicians so its conclusion was against the overwhelming weight of the evidence (Point I) and it rejected Missouri law that recognizes an asymptomatic, preexisting condition can be compensable if a work accident aggravates it to a level of disability (Point II). We find the Commission's award concluding Claimant was not permanently and totally disabled and Claimant was not entitled to future medical treatment is supported by sufficient competent evidence. However, we find the Commission's award determining medical causation and concluding Claimant suffered only five percent permanent partial disability is not supported by sufficient competent evidence. Accordingly, the award is affirmed in part and reversed and modified in part.

### Factual and Procedural Background[1]

Claimant began working for Ralls County ("Employer") in July 2007 performing road work, including driving a dump truck. On March 9, 2009, Claimant and a co-worker were told to change a 350-pound tire and wheel assembly on a backhoe. They began by breaking the seal on the tire away from the rim. After completing one side of the tire, Claimant stooped forward to lift the tire and flip it over. As Claimant lifted the tire, he felt a painful sensation in his lower

---

[1] As an initial matter, we note both Claimant's and Employer's statement of facts contain deficiencies that do not comply with Rule 84.04. Compliance with Rule 84.04 briefing requirements is mandatory and "a party's failure to comply with those requirements constitutes grounds for our dismissal of the appeal." *Osthus v. Countrylane Woods II Homeowners Ass'n*, 389 S.W.3d 712, 714 (Mo. App. E.D. 2012) (internal quotations omitted). Failure to comply with Rule 84.04 preserves nothing for appellate review. *In Matter of Smith*, 550 S.W.3d 541, 543 n.1 (Mo. App. E.D. 2018) (internal quotations omitted).

Rule 84.04 specifically provides the appellant's brief must contain "a fair and concise statement of the facts relevant to the questions presented for determination without argument." MO. SUP. CT. R. 84.04(c). If the respondent is dissatisfied with the accuracy of the statement of facts in the appellant's brief, the respondent's brief may include a statement of facts. MO. SUP. CT. R. 84.04(f). This Court has acknowledged "the primary purpose of the statement of facts is to afford an immediate, accurate, complete and unbiased understanding of the facts of the case." *In re Marriage of Shumpert*, 144 S.W.3d 317, 320 (Mo. App. E.D. 2012). Interspersing argument throughout the statement of facts violates Rule 84.04(c). *Bethman v. Faith*, 462 S.W.3d 895, 900 (Mo. App. E.D. 2015). Claimant's "Statement of Facts" improperly contains legal conclusions and arguments. Employer's brief did not contain a concise statement of the errors in Claimant's statement of facts, thus leaving it to this Court to prepare its own fair and concise statement of the facts.

back and legs, which he described as feeling like someone was "squishing a jelly donut" and "stabbing [him] in the back with a knife." Claimant finished his shift but could not complete any of his duties and instead laid on a couch in a breakroom. Claimant drove himself home after his shift ended.

The next day, Claimant drove himself to work and requested medical treatment. After a few hours of work, he went to the emergency room. While in the emergency room, x-rays showed spondylosis.[2] He was prescribed some medicine and was told to follow up with his primary physician. Claimant was thirty years old, and he experienced no low back pain or radiculopathy in either leg before the 2009 work accident. Two days later, Claimant followed up with Dr. R.W. Hevel, his primary physician. Dr. Hevel noted Claimant complained he was experiencing low back pain, muscle spasms, and numbness and tingling in his right lower extremity. Dr. Hevel diagnosed lumbar radiculopathy and ordered an MRI of Claimant's spine ("the March 2009 MRI").

Claimant was referred to Dr. James Coyle, a neurosurgeon, for further authorized treatment. In his initial evaluation of Claimant on March 23, 2009, Dr. Coyle reviewed the March 2009 MRI and determined it showed "evidence of degenerative disc disease at L4-5 and L5-S1 *with* central disc protrusions at both levels" and bilateral L5 spondylolysis.[3] (emphasis added). Dr. Coyle diagnosed lumbar disc herniations and prescribed physical therapy, medication, and epidural steroid injections with restrictions of no lifting over ten pounds, no repetitive bending, stooping, or twisting at the waist, and intermittent sitting, standing, and walking. Dr. Coyle also recommended Claimant not drive dump trucks. Claimant received

---

[2] "Spondylosis" is defined as "any of various degenerative diseases of the spine." *Spondylosis*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/medical/spondylosis (last visited Sept. 16, 2019).

[3] "Spondylolysis" is defined as "disintegration or dissolution of a vertebra." *Spondylolysis*, https://www.merriam-webster.com/medical/spondylolysis (last visited Sept. 16, 2019).

epidural steroid injections from Dr. Gregory Smith. Upon his evaluation of Claimant, Dr. Smith assessed lumbrosacral "radiculitis," right S1 "radicular" pain, and L5-S1 spondylolysis without listhesis. At his physical therapy sessions, Claimant was described as "a middle aged man who presents today with acute onset of back pain after an injury at work while changing a tire on machinery." The therapists noted Claimant repeatedly did not give consistent effort during strength testing, suggesting symptom magnification.

Dr. Coyle subsequently examined Claimant on April 20, 2009, and again on May 20, 2009. On May 20, 2009, Dr. Coyle noted Claimant complained of "back pain, right sided buttock and posterior thigh pain, and dysesthesia radiating into his right foot." Dr. Coyle again reviewed the March 2009 MRI, this time concluding "[h]e has a central disc prolapse at L4-5. He has isthmic spondylolisthesis at L5-S1 with a very small central disc protrusion."[4] Dr. Coyle also noted Claimant had undergone three epidural steroid injections without relief. Dr. Coyle recommended pain management and a rehabilitation program and advised against surgery, stating surgery should be an "absolute last resort" because a "two level fusion" would not return Claimant to his pre-injury state.

Dr. Coyle referred Claimant to Dr. Russell Cantrell, a physiatrist, who he saw on May 27, 2009. Dr. Cantrell noted Claimant presented with complaints suggestive of right L5 "radiculopathy." Dr. Cantrell ordered an EMG study, which was conducted June 6, 2009. The results of the EMG were normal; no electrodiagnostic evidence of lumbar radiculopathy was detected. Dr. Cantrell also reviewed the March 2009 MRI and concluded it showed evidence of "degenerative disc disease at the L4-5 and L5-S1 levels *with* broad based disc bulging at L5-S1 and a more focal central and paracentral disk protrusion at L5-S1 appearing to result in some

---

[4] "Spondylolisthesis" is defined as "forward displacement of a lumbar vertebra on the one below it and especially of the fifth lumbar vertebra on the sacrum producing pain by compression of nerve roots." *Spondylolisthesis*, https://www.merriam-webster.com/medical/spondylolisthesis (last visited Sept. 16, 2019).

4

compression of the descending S1 nerve root." (emphasis added). Dr. Cantrell concurred in Dr. Coyle's opinion that Claimant was not a good surgical candidate. Dr. Cantrell prescribed Claimant Tramadol and Prevacid to manage his pain.

On June 17, 2009, Dr. Cantrell released Claimant to return to work with the restriction he not lift over ten pounds. Claimant returned to work for Employer that same day. Claimant said he used leave to reduce the number of hours he drove so he did not consider himself to be working a full time schedule. Claimant underwent a functional capacity evaluation on June 29, 2009. At the evaluation, Claimant lifted fifty-five pounds from floor to waist and seventy-five pounds from both waist to shoulder and from shoulder to overhead. Claimant's performance at the evaluation reflected inconsistent effort and symptom magnification behaviors. The evaluation found him able to return to safe function in the heavy work demand level but not the employer-reported job demand level. The evaluation reflected Claimant was limited by his decreased heavy load handling ability, his decreased tolerance to constant sitting, and his moderate-to-high subjective pain reports.

Claimant saw Dr. Cantrell immediately following the functional capacity evaluation on June 29, 2009, and again on July 21, 2009. Because of Claimant's ongoing complaints, Dr. Cantrell referred him for a lumbar myelogram and post-myelogram CT scan. According to Dr. Cantrell, that scan showed mild spondylolisthesis of L5-S1, with associated spondylolysis, a small left foraminal disc extrusion at L5-S1, circumferential disc bulging at L5-S1, small central disc protrusions at L3-4, *and* a degenerative disk bulges at L3-4 and L4-5. (emphasis added).

Upon reviewing the results of the July 2009 lumbar myelogram and post-myelogram CT scan, Dr. Cantrell rated Claimant's permanent partial disability at eight percent of the body as a whole referable to his low back, with one-half attributable to his work injury and one-half

attributable to preexisting degenerative and congenital abnormalities unrelated to his work injury. On August 31, 2009, Dr. Cantrell placed Claimant at maximum medical improvement and released him from care with a permanent restriction he not lift over fifty pounds and that his dump truck driving be limited to one hour of sitting per run.[5]

On August 25, 2010, Claimant saw Dr. Coyle, claiming his symptoms remained intolerable. Dr. Coyle continued to recommend against surgery, stating "a fusion at L5-S1 may possibly result in very brief relief of symptoms and aggravate the pathology proximal to this." Dr. Coyle referred Claimant for a follow-up EMG to "see if there is any possibility that we can help [Claimant] with a one-level anterior interbody arthrodesis alone." On September 15, 2010, Dr. Cantrell conducted the follow-up EMG study ("the September 2010 EMG"). The results revealed "abnormalities of fibrillations and polyphasic motor unit potentials in the left gastrocnemius and polyphasic motor unit potentials in the right gastrocnemius, both of which are supplied by the S1 nerve root." No radiculopathy at L4 or L5 was noted.

On October 27, 2010, Dr. Coyle reviewed the September 2010 EMG study's results and concluded they showed "S1 radiculopathy." Dr. Coyle ordered a second MRI, which showed "mild dessication at L4 and L5 with annular tears at each level, L4-L5 as generalized bulging *with* focal and central and right paracentral disc protrusion with the same finding at L5-S1, with the addition of an annular tear." (emphasis added). He noted Claimant had an abnormally small spinal canal and a congenital condition. Dr. Coyle found there was mild disc pathology but no focal compressive pathology. Dr. Coyle continued to recommend against surgery, stating, "In summary there is no good surgical solution for him, and he may be a mismatch for driving a dump truck over time." Dr. Coyle did not see Claimant again after October 27, 2010. In a letter

---

[5] Claimant and Employer stipulate that Claimant was at maximum medical improvement as of August 31, 2009.

to Dr. Coyle dated November 15, 2010, Dr. Cantrell indicated that he planned to see Claimant every six months, even though Claimant remained at MMI, to maintain Claimant's medications.

Dr. Cantrell saw Claimant again on June 8, 2011, regarding a refill of his prescriptions. In a letter to Dr. Coyle, Dr. Cantrell stated that, as of June 8, 2011, there was "no objective evidence to support his subjective complaints of radiating pain into both lower extremities." However, in that same letter, Dr. Cantrell recounted that the March 2009 MRI scan of Claimant's lumbar spine "revealed a central and paracentral disc protrusion at the L5-S1 level that appeared to result in some compression of the descending S1 nerve root." He also stated that the July 2009 lumbar myelogram and post-myelogram CT scan "revealed evidence of spondylolisthesis of L5 on S1, along with circumferential disc bulge and a small central disc protrusion at the L3-4 level, with degenerative disc bulge at L3-4 and L4-5."

In a letter to Employer's attorney dated June 17, 2011, Dr. Cantrell stated the September 2010 EMG study revealed findings consistent with "*chronic* bilateral S1 radiculopathy in the absence of any L4 or L5 denervation and the absence of any peripheral polyneuropathy." (emphasis added). Dr. Cantrell further stated he believed the medications and relief symptoms Claimant sought resulted from a degenerative process rather than the specific work injury Claimant sustained on March 9, 2009.[6] Dr. Cantrell opined the only basis to suggest Claimant's current and ongoing back pain complaints relate to his 2009 work accident was Claimant's "verbal history that prior to that date he was asymptomatic, and subsequent to that date, he remained symptomatic." He based his opinion, in part, on the June 2009 EMG study's failure to

---

[6] Dr. Cantrell had previously concluded the medication prescribed "for pain complaints would be half related to his work injury and half related to pre-existing degenerative changes" after reviewing the results of Claimant's lumbar myelogram and post-myelogram CT scan administered in July 2009. The Commission found Dr. Cantrell reached this final conclusion on June 17, 2011, after reviewing additional medical records from Claimant's visits to Hannibal Regional Hospital in January and April 2011.

reveal acute electrodiagnostic abnormalities suggesting an acute radiculopathy attributable to his 2009 work injury. He also opined that the September 2010 EMG study's results seemed more consistent with a progressive degenerative process in the lower lumbar spine rather than an acute injury at the nerve root level.

Employer paid temporary total disability benefits to Claimant in the amount of $4,586.29 from March 9, 2009, through June 14, 2009, at a rate of $330.97 per week. Employer paid medical aid to Claimant in the amount of $51,464.55.

Claimant continued working until March 25, 2011.[7] On March 29, 2011, four days after stopping work, Claimant saw Dr. Hevel because he was experiencing symptoms of depression. Dr. Hevel noted Claimant's depression "originate[d] from his back" and assessed Claimant as having major depression as secondary to a history of chronic back pain. Dr. Hevel recommended Claimant not work for one month and referred Claimant to see Dr. Jonathan Colen, a psychiatrist.

From May until July 2011, Claimant saw Dr. Colen several times. During their May and June 2011 sessions, Dr. Colen and Claimant discussed that Claimant was recently separated from his wife and children. Claimant said his wife left him, took the children, and falsely reported to the Missouri Department of Family Services he molested his eleven-year-old stepdaughter and beat all of the children. Dr. Colen diagnosed Claimant with moderate single episode major depression and prescribed medication. By July 7, 2011, Claimant reported to Dr. Colen that he felt better and had experienced some improvement in his mood.

In addition to seeing Dr. Colen, Claimant saw therapist Sean Meyer in June 2011. Claimant discussed his personal problems relating to his home life, the abuse allegations, and his

---

[7] Claimant testified he stopped working on March 25, 2011, because he was "laid off." However, Claimant was later terminated by Employer in December 2011. It is not clear from the record why Claimant stopped working on March 25, 2011.

8

pending divorce with Mr. Meyer. Mr. Meyer noted Claimant was not working due to his back injury and felt frustrated by the pain and physical limitations placed on his work abilities. Mr. Meyer diagnosed Claimant with adjustment disorder with anxiety and partner relational problem and concluded the source of Claimant's mental stress was the abuse allegations against him, his marital problems, and the ongoing stress and uncertainty as to whether he would return to work due to work-related injury.

On July 22, 2011, Claimant saw Dr. Hevel again for his depression. Dr. Hevel recommended Claimant remain off work for three more months because of his recurring mood swings and the added stress from his divorce. On August 30, 2011, Claimant was arrested, charged with statutory sodomy of his stepdaughter, and taken into custody. Claimant remained incarcerated from August 30, 2011, until he was released on bail on approximately August 15, 2013.[8] After several months of absence from work, Claimant received a letter from Employer stating he was terminated in December 2011.

Claimant filed a claim for workers' compensation benefits for his back injury. Before trial, Claimant dismissed his claim against the Second Injury Fund. On November 17, 2017, a hearing was held before an ALJ. The parties asked the ALJ to determine (1) whether Claimant sustained an injury arising out of and in the course of his employment; (2) medical causation regarding Claimant's low back injury; (3) whether Claimant was permanently and totally disabled; and (4) whether Employer was responsible for future medical treatment to treat and relieve the effects of Claimant's low back injury.

At the hearing, Claimant testified about the circumstances of his 2009 work accident and the physical pain he felt in his low back that continued to worsen. He testified he was no longer

---

[8] There is no evidence in the record that Claimant was convicted of any crime. Claimant reports he was acquitted of all charges.

depressed. He indicated he was using a cane while walking to support himself for two or three years because he would fall for no reason.[9] Claimant testified he goes to the emergency room because of pain around twenty times per year.[10]

Claimant presented the deposition testimony of Dr. Thomas Musich, a family practice medical doctor and independent medical examiner. Dr. Musich conducted an independent medical examination of Claimant on June 5, 2013, at Claimant's attorney's request. He found Claimant's March 2009 MRI identified "a broad based disc bulge causing effacement of the anterior thecal sac with associated hypertrophy at L4-5. At L5-S1 a central disc protrusion was identified which abutted the S1 and S2 neural roots in the thecal sac. Suggestion of bilateral pars defect was also identified." He found Claimant suffered acute lumbar trauma from the 2009 work accident. He noted Claimant had no preexisting disability and found the 2009 work accident was the prevailing factor in causing all Claimant's persistent and ongoing low back pain and radiculopathy.

Dr. Musich further opined that Claimant suffered depression secondary to the 2009 work accident and chronic low back pain and may require psychiatric evaluation intermittently. Dr. Musich noted Claimant had seen Dr. Colen for a psychiatric exam in May 2011, where he was diagnosed with single episode major depressive disorder but was otherwise unaware of Claimant's personal struggles—that his wife left him, took his children, filed for divorce, and accused him of statutory sodomy for which he was charged, arrested, and jailed for two years.

Dr. Musich embraced the treatment records and observations of Dr. Coyle and recommended Claimant observe permanent work restrictions of not lifting over fifty pounds and

---

[9] The record before us fails to show any doctor diagnosed issues with his gait or recommended any assisted walking device.

[10] No medical records associated with these visits are in evidence.

alternating sitting and standing.[11]  Dr. Musich's conclusions were derived from the history Claimant relayed to him and his own physical examination of Claimant.  Dr. Musich reviewed the reports of the other doctors who read the results of the diagnostic studies, but he did not review those studies himself.  Dr. Musich concluded if Claimant could not be placed in an appropriate job setting through vocational rehabilitation, then Claimant was permanently and totally disabled solely because of the 2009 work accident.  Dr. Musich concluded if Claimant could be placed, then Claimant suffered permanent partial disability of sixty-five percent of the body as a whole secondary to acute, work related, symptomatic, low back pain and residual bilateral lower extremity radiculopathy solely because of the 2009 work accident. Dr. Musich did not prescribe or recommend medication.

Claimant also presented the deposition testimony of Mr. Gary Weimholt, a vocational rehabilitation consultant.  On July 19, 2013, Mr. Weimholt reviewed Claimant's medical records and interviewed Claimant.  Mr. Weimholt noted Claimant was divorced.  When his report was made, Claimant's visitation rights had not been solidified and Claimant mentioned he was having money issues regarding supporting the children.  Mr. Weimholt noted Claimant said he could not continue to work for Employer because he became depressed and had continued pain from the 2009 work accident.  Although Mr. Weimholt noted Claimant had seen Dr. Colen for a psychiatric exam in May 2011, he did not know Claimant's wife accused him of statutory sodomy for which he was charged, arrested, and jailed for two years.

Mr. Weimholt noted he did not know of any medical records of low back treatment or diagnoses preexisting the 2009 work accident.  He further noted Dr. Coyle's initial ten pound lifting restriction and Dr. Cantrell's permanent fifty pound lifting restriction.  Mr. Weimholt

[11] Dr. Musich added as a work restriction that Claimant should be given the opportunity to lie flat or in a recliner on an as-needed basis to treat post-traumatic work-related low back pain and bilateral lower extremity radiculopathy.

11

concluded Claimant had no transferable skills and Claimant would need assistance completing a GED diploma. In reaching his opinion, Mr. Weimholt also emphasized Claimant had never sent an email, had no typing or keyboard training, and had never used a computer before in any of his jobs. Based solely on the permanent work restrictions related to Claimant's work injury to his low back, Mr. Weimholt found Claimant was without access to the open labor market and totally vocationally disabled from employment.

Employer presented the deposition testimony of Dr. Edwin Wolfgram, a psychiatrist. On January 16, 2015, Dr. Wolfgram examined Claimant. Dr. Wolfgram noted Claimant's personal legal problems, including his divorce and the abuse allegations. Dr. Wolfgram noted Claimant had an addictive personality because he smoked from one-half to one and one-half packs of cigarettes per day from an early age and drank fifteen cups of coffee per day. Dr. Wolfgram noted Mr. Meyer's conclusion that the more likely cause of Claimant's mental stress was that he was involved in a dangerous marriage with a wife who had conspired with his stepdaughter to charge him with child molestation. Dr. Wolfgram also noted that neither Dr. Musich nor Mr. Weimholt knew of the personal struggles ongoing in Claimant's life, including the fact Claimant spent two years incarcerated. Dr. Wolfgram stated that the source of Claimant's depression was his marital and social problems and his addictive personality. Dr. Wolfgram concluded Claimant suffered no psychiatric disability due to the injury he sustained on March 9, 2009, and the 2009 work accident was not the prevailing factor in causing his depression. Dr. Wolfgram further concluded the use of pain medications to treat Claimant's back pain was unnecessary and not advisable, as pain medications that elevate mood should only treat injuries for a short period because they "are highly addicting and dangerous to use for any chronic conditions."

Employer also presented the deposition testimony of Dr. Robert Bernardi, a neurosurgeon. Dr. Bernardi conducted an independent medical examination of Claimant at Employer's request on November 10, 2015. Dr. Bernardi diagnosed Claimant with congenital lumbar stenosis, multi-level degenerative disk disease, L5-S1 isthmic spondylolisthesis, and low back and bilateral leg pain of uncertain cause. Dr. Bernardi stated all of the diagnosed conditions except the low back and bilateral leg pain were preexisting conditions to the 2009 work accident. Dr. Bernardi opined Claimant was born with the congenital stenosis, the degenerative disc disease is governed by genetic influences, and it is extremely unusual for spondylolisthesis to become symptomatic in adulthood because of a singular traumatic event.[12] Dr. Bernardi concluded the 2009 work accident may have caused a strain or sprain in Claimant's back, but those symptoms should have resolved within four to six weeks. Dr. Bernardi concluded the radiographic studies showed no acute injury and no objective findings explain Claimant's complaints.

Dr. Bernardi acknowledged Claimant's lack of back pain before the 2009 work accident suggested the 2009 work accident was the prevailing cause of his pain. But Dr. Bernardi concluded the underlying condition causing the pain was not clearly identifiable from the objective evidence available. Dr. Bernardi did not have a medical explanation for Claimant's back pain. Dr. Bernardi concluded the work accident caused Claimant to suffer permanent partial disability of two percent of the body as a whole related to a chronic sprain or strain or non-specific back pain. Dr. Bernardi stated he did not believe Claimant required any prescription medication to cure and relieve him from the effects of the back injury caused by the 2009 work accident. According to Dr. Bernardi, Claimant required no restrictions.

---

[12] Dr. Bernardi indicated that spondylolisthesis is developed most commonly by athletic people during childhood, not by adults as a result of trauma.

Dr. Bernardi's summary of Dr. Coyle's May 20, 2009, notes did not include Dr. Coyle's positive findings of dysesthesias into the anterior thighs and calves plus diffuse tingling in both feet or of "herniations" at L4-5 and L5-S1. Dr. Bernardi reviewed the September 2010 EMG results and concluded "polyphasic motor unit potentials were present in both gastrocnemii suggestive of *chronic* S1 radiculopathy." (emphasis added). Dr. Bernardi reviewed the July 2009 lumbar myelogram and post-myelogram CT scan and concluded there was presence of degenerative disc disease at both L3-4 and L4-5 manifested by central disc bulging and posterior spur formation. Dr. Bernardi reviewed the October 2010 MRI and reached the same conclusion.

On cross-examination, Dr. Bernardi disagreed with Dr. Coyle's conclusion that Claimant showed symptoms of radicular pain. Although Dr. Bernardi acknowledged Dr. Hevel's note of radiating pain just two days after the 2009 work accident, he disagreed about whether that demonstrated actual "radicular" pain. He stated radicular pain occurs for several reasons besides a "pinched nerve in the back" but gave no opinion as to what caused Claimant's leg pain. Dr. Bernardi admitted that "disk herniations are by definition acute." Dr. Bernardi also agreed that, in the younger population, disk herniations and acute disk prolapses are the most common cause of radiculopathy.

Employer also presented the deposition testimony of James England, a vocational rehabilitation counselor. On January 19, 2016, Mr. England reviewed Claimant's medical records and Mr. Weimholt's rehabilitation report and testing. Mr. England summarized the heavy lifts recorded at Claimant's functional capacity evaluation conducted on June 29, 2010. Mr. England noted the restrictions imposed by Dr. Coyle, which included medium work activity with frequent positional changes every hour, and Dr. Cantrell's recommended permanent lifting restriction of fifty pounds. He also noted Dr. Bernardi did not recommend any restrictions and

14

agreed Dr. Bernardi's opinions were "inconsistent" with the other doctors' findings. Mr. England concluded Claimant had transferable skills for service writing for general mechanics and equipment operation. He found, assuming the restrictions of Drs. Coyle and Cantrell, there were many jobs at the medium demand level in the open market that Claimant could perform, such as cashier, security positions, cab driver, courier, and others. Mr. England noted through review of achievement test results that Claimant had the apparent ability to complete the preparation and requirements for a GED diploma, but he had made no efforts to pursue it. Mr. England concluded Claimant was capable of returning to work in the open labor market and was not totally and permanently disabled.

The ALJ concluded: (1) On March 9, 2009, Claimant sustained a work-related accident arising out of and in the course of his employment; (2) Claimant's low back injury was medically causally related to the 2009 work accident; (3) Claimant was permanently and totally disabled; and (4) Employer was responsible for future medical treatment to cure and relieve the effects of Claimant's work injury. In his findings and conclusions, the ALJ specifically found Claimant's testimony he never had low back pain or treatment before the 2009 work accident credible. The ALJ determined Dr. Coyle's initial diagnosis of lumbar disc herniations with a history of a work-related accident also proved consistent with Claimant's treatment record and patient history. Largely because it paralleled Dr. Coyle's diagnosis and treatment plan, the ALJ also specifically found Dr. Musich's testimony "more convincing" than Dr. Bernardi's. In so finding, the ALJ reasoned that Dr. Musich's opinions were traceable to the objective findings in the treatment records and tests and were consistent with Claimant's credible testimony.

The ALJ supported his conclusion that the 2009 work accident caused Claimant to be permanently and totally disabled, despite any of his preexisting asymptomatic degenerative

conditions, by citing *Weinbauer v. Grey Eagle Distributors*, 661 S.W.2d 652, 654 (Mo. App. E.D. 1983), which held "[a]n inherent weakness or bodily defect, such as spondylolisthesis, occurring in conjunction with an abnormal strain . . . will support a claim for compensation." Finally, because "Dr. Musich, and to a lesser extent Dr. Cantrell's plan to follow up with Claimant every six months to monitor his medication, each credibly endorse[d] Claimant's need for ongoing medication," the ALJ determined Claimant was entitled to future medical benefits. Employer applied for review with the Commission, challenging the ALJ's determinations regarding medical causation, the nature and extent of Claimant's disability, and Employer's responsibility for providing future medical benefits.

On review, a majority of the Commission found Claimant was neither permanently and totally disabled nor entitled to any future medical treatment. Accordingly, the Commission entered a final award modifying the ALJ's award to reflect that Claimant suffered five percent permanent partial disability to his body as a whole referable to the low back and that Claimant was not entitled to any future medical benefits.

The Commission concluded Claimant sustained a work-related accident on March 9, 2009, that arose out of and in the course of his employment because he suffered an "unusual strain" producing objective symptoms of an injury during his shift at work. The Commission further concluded that because only "some of the symptoms" Claimant experienced resulted from the 2009 work accident, the 2009 work accident was the prevailing factor causing Claimant to suffer only a chronic back sprain or strain. The Commission did not find the 2009 work accident was the prevailing factor causing either Claimant's degenerative and congenital conditions to worsen or Claimant's depression for which he was briefly treated in 2011.

16

The Commission refused to rely on *Weinbauer*, as the ALJ had, in reaching its conclusion as to the level of Claimant's disability. The Commission declined to follow *Weinbauer* because *Weinbauer* was decided before the 2005 amendments to § 287.020.2,[13] and after the 2005 amendments, a condition is not compensable if work was a precipitating or triggering factor.

In deciding Claimant's case, the Commission found the medical opinions of Drs. Bernardi, Coyle, and Cantrell were "more persuasive" than the opinion offered by Dr. Musich. The Commission stated that Drs. "Bernardi, Coyle, and Cantrell consistently conclude[d] the majority of [Claimant's] symptoms are from degenerative and congenital conditions, objectively identified through testing." The Commission further found Mr. England's vocational rehabilitation opinion was "more persuasive" than Mr. Weimholt's.

The Commission concluded Claimant did not need additional medical treatment resulting from his back injury, as derived strictly from the back sprain. The Commission found credible the medical findings of Drs. Bernardi, Wolfgram, and Cantrell, who opined the pain medications prescribed were for treatment of degenerative conditions rather than any acute or chronic residual pain from the back strain or that the pain medications were unnecessary or advisable. The Commission also found that because Claimant had not proven his depression resulted from the 2009 work accident, no future medical treatment was needed.

Commissioner Curtis E. Chick, Jr. filed a separate opinion, concurring in part and dissenting in part with the majority's opinion. Commissioner Chick agreed with all determinations adopted by the majority, including that Claimant did not prove permanent total disability. However, Commissioner Chick would have found Claimant suffered ten percent permanent partial disability rather than five percent, as found by the majority.

Claimant appeals the Commission's decision.

---

[13] All references are to RSMo Cum. Supp. (2013) unless otherwise indicated.

**Standard of Review**

The Missouri Constitution, article V, section 18 (amended 1976)[14] and § 287.495 govern

appeals of the Commission's decision. *Kolar v. First Student, Inc.*, 470 S.W.3d 770, 774 (Mo.

App. E.D. 2015). Section 287.495.1 provides:

> The court, on appeal, shall review only questions of law and may modify, reverse, remand for rehearing, or set aside the award upon any of the following grounds and no other:
>
> (1) That the commission acted without or in excess of its powers;
>
> (2) That the award was procured by fraud;
>
> (3) That the facts found by the commission do not support the award;
>
> (4) That there was not sufficient competent evidence in the record to warrant the making of the award.

§ 287.495.1; *See also Hornbeck v. Spectra Painting, Inc.*, 370 S.W.3d 624, 629 (Mo. banc 2012).

The Commission's factual findings are binding and conclusive only to the extent they are

supported by sufficient competent evidence and were reached in the absence of fraud. *Archer v.*

*City of Cameron*, 460 S.W.3d 370, 374 (Mo. App. W.D. 2015) (citing *Coday v. Div. of Emp't*

*Sec.*, 423 S.W.3d 775, 778 (Mo. banc 2014)). In reviewing the Commission's decision, we view

the evidence objectively and are not required to "view the evidence and all reasonable inferences

drawn therefrom in the light most favorable to the award." *Wilson v. Progressive Waste Sols. of*

*Missouri, Inc.*, 515 S.W.3d 804, 807 (Mo. App. E.D. 2017) (quoting *Hampton v. Big Boy Steel*

---

[14] MO. CONST. art. V, § 18 states, in relevant part:

> All final decisions, rules and orders on any administrative officer or body existing under the constitution or by law, which are judicial or quasi-judicial and affect private rights, shall be subject to direct review by the courts as provided by law; and such review shall include the determination whether the same are authorized by law, and in cases in which a hearing is required by law, whether the same are supported by competent and substantial evidence upon the whole record.

*Erection*, 121 S.W.3d 220, 223 (Mo banc. 2003)). Instead, "[w]e examine the evidence in the context of the whole record when determining whether the award is supported by competent and sufficient evidence. An award that is contrary to the overwhelming weight of the evidence is, in context, not supported by competent and substantial evidence."[15] *Greer v. SYSCO Food Servs.*, 475 S.W.3d 655, 664 (Mo. banc 2015) (quoting *Hampton*, 121 S.W.3d at 223).

This Court must determine whether the Commission reasonably could have made its findings and reached its result based upon all the evidence before it. *Porter v. RPCS, Inc.*, 402 S.W.3d 161, 171 (Mo. App. S.D. 2013) (quoting *Fitzwater v. Dep't of Public Safety*, 198 S.W.3d 623, 627 (Mo. App. W.D. 2006)). In doing so, this Court is not bound by the Commission's conclusions of law or application of law to the facts. *Patterson v. Cent. Freight Lines*, 452 S.W.3d 759, 764 (Mo. App. E.D. 2015) (citing *Grubbs v. Treasurer of Missouri as Custodian of Second Injury Fund*, 298 S.W.3d 907, 910 (Mo. App. E.D. 2010)).

---

[15] In *Hampton v. Big Boy Steel Erection*, the Supreme Court of Missouri recognized "[t]he constitutional standard ('supported by competent and substantial evidence upon the whole record') is in harmony with the statutory standard ('sufficient competent evidence in the record')." 121 S.W.3d 220, 222 (Mo. banc 2003). For clarity in this opinion, we use "sufficient competent evidence," unless quoting from another authority. For a detailed history of this standard of review, see *Davis v. Research Med. Ctr.*, 903 S.W.2d 557 (Mo. App. W.D. 1995).

## Discussion[16]

### Point One

In his first point relied on, Claimant asserts "the Commission erred in reducing the ALJ's award, because its conclusion was against the overwhelming weight of the evidence, in that the Commission misstated the record before it while disregarding the findings and conclusions of the Employer's treating physicians."

### *Against the Overwhelming Weight of the Evidence Challenge*

Employer argues Claimant has not raised a recognizable challenge this Court may consider. Employer urges the appellate courts do not "have authority to countermand an award of the Commission as against the overwhelming weight of the evidence," citing the Southern District's opinion in *Nichols v. Belleview R-III School District*, 528 S.W.3d 918 (Mo. App. S.D. 2017) as authority for its argument. Employer cites to the following language in a footnote of the *Nichols* decision to convince this Court of its position: "In the wake of *Hampton*, the against-the-overwhelming-weight-of-the-evidence challenge has been subsumed by the sufficient-competent-evidence challenge; the only challenge now contemplated by § 287.495.1(4) is not supported by sufficient competent evidence in the record." *Id.* at 928 n.17. However, Employer's reliance on *Nichols* is misplaced. Since the *Nichols* decision in 2017, the Southern

---

[16] We note that none of Claimant's points relied on comply with Rule 84.04(d)(2) or follow the format set out in that rule. Under Rule 84.04(d)(2), where the appellate court reviews the decision of an administrative agency, each point shall be in "substantially the following form:"

> The [*name of agency*] erred in [*identify the challenged ruling or action*], because [*state the legal reasons for the claim of reversible error, including the reference to the applicable statute authorizing review*], in that [*explain why, in the context of the case, the legal reasons support the claim of reversible error*].

Each point fails to reference the applicable statute authorizing review or explain why, in the context of the case, legal reasons support its claim of reversible error. Although these violations constitute grounds for dismissal, it is within this Court's discretion to consider the claims if the briefing deficiencies are not so serious as to impede appellate review. *Bolt v. Giordano*, 310 S.W.3d 237, 242 (Mo. App. E.D. 2010). Therefore, we exercise our discretion *ex gratia* to review Claimant's assertions.

20

District has continued to recognize that challenging the Commission's award as not supported by sufficient competent evidence is synonymous with challenging the Commission's award as against the overwhelming weight of the evidence. *See Robinson v. Loxcreen Co., Inc.*, 571 S.W.3d 247, 249 (Mo. App. S.D. 2019); *Farmer v. Treasurer of Missouri as Custodian of the Second Injury Fund*, 567 S.W.3d 228, 231 (Mo. App. S.D. 2018); *Elsworth v. Wayne Cty.*, 547 S.W.3d 599, 601 (Mo. App. S.D. 2018). The Southern District's recitation of the standard of review applicable to § 287.495.1 challenges aligns with Supreme Court of Missouri precedent.[17] Accordingly, we conclude Claimant brings a recognizable challenge.

*Permanent Total Disability*

Claimant argues the Commission's determination he is not permanently and totally disabled because no objective evidence exists showing radiculopathy or an acute injury stemming from the 2009 work accident is against the overwhelming weight of the evidence. Because of this alleged error, Claimant argues the Commission improperly modified the ALJ's award of permanent total disability to just five percent permanent partial disability.

Total disability is defined as the "inability to return to any employment and not merely [the] inability to return to the employment in which the employee was engaged at the time of the accident." § 287.020.6. "An employee is permanently and totally disabled if no employer in the

---

[17] *See Greer v. SYSCO Food Servs.*, 475 S.W.3d 655, 664 (Mo. banc 2015) ("Whether the award is supported by competent and substantial evidence is judged by examining the evidence in the context of the whole record. An award that is contrary to the overwhelming weight of the evidence is, in context, not supported by competent and substantial evidence."); *Malam v. State, Dep't of Corr.*, 492 S.W.3d 926, 928 (Mo. banc 2016) ("[T]he court must sill 'examine the whole record to determine if it contains sufficient competent and substantial evidence to support the award, i.e., whether the award is contrary to the overwhelming weight of the evidence.'"); *Johme v. St. John's Mercy Healthcare*, 366 S.W.3d 504, 509 (Mo. banc 2012) ("The whole record is considered to determine if there is sufficient competent and substantial evidence to support the Commission's award. An award that is contrary to the overwhelming weight of the evidence is, in context, not supported by competent and substantial evidence."); *Miller v. Missouri Highway & Transp. Comm'n*, 287 S.W.3d 671, 672 (Mo. banc 2009) ("A court must examine the whole record to determine if it contains sufficient competent and substantial evidence to support the award, i.e., whether the award is contrary to the overwhelming weight of the evidence. Whether the award is supported by competent and substantial evidence is judged by examining the evidence in the context of the whole record.").

usual course of business would reasonably be expected to employ the employee in his or her present physical condition." *Pennewell v. Hannibal Reg'l Hosp.*, 390 S.W.3d 919, 924-25 (Mo. App. E.D. 2013) (citing *Clark v. Harts Auto Repair*, 274 S.W.3d 612, 616 (Mo. App. W.D. 2009)). The burden is on the claimant to establish he is permanently and totally disabled. *Id.*

Whether a Claimant is permanently and totally disabled is a factual question, not a legal question. *Archer v. City of Cameron*, 460 S.W.3d 370, 376 (Mo. App. W.D. 2015) (citing *Rader v. Werner Enters., Inc.*, 460 S.W.3d 370, 375 (Mo. App. E.D. 2012)). Generally, we must defer to the Commission's factual findings. *Thornton v. Haas Bakery*, 858 S.W.2d 831, 833 (Mo. App. E.D. 1993), overruled on other grounds by *Hampton*, 121 S.W.3d 220. However, when those findings are not supported by sufficient competent evidence, no deference is required. *Archer*, 460 S.W.3d at 376.

Because Claimant brings a weight of the evidence challenge, he triggers a specific analytical process whereby he must:

1. Identify a factual proposition needed to sustain the result;

2. Marshal all record evidence supporting that proposition;

3. Marshal contrary evidence of record, subject to the factfinder's credibility determinations, explicit or implicit; and

4. Prove, in light of the whole record, that the step 2 evidence and its reasonable inferences are so non-probative that no reasonable mind could believe the proposition.

*Jordan v. USF Holland Motor Freight, Inc.*, 383 S.W.3d 93, 95 (Mo. App. S.D. 2012).

Here, Claimant identified the factual proposition as whether Claimant suffered radiculopathy and an acute injury because of the 2009 work accident. Claimant then identified the supporting evidence for that position while juxtaposing it against what he perceived to be the

22

contrary evidence. Claimant contends the evidence the Commission relied on was not probative given the radiographic and electrodiagnostic evidence in the record.

Claimant points to several factual findings of the Commission he argues are not supported by the record: (1) the objective evidence did not support Dr. Musich's opinion that all Claimant's symptoms could be attributed to his 2009 work accident; (2) the objective evidence supported Dr. Cantrell's opinion that no objective findings explain Claimant's complaints of radiating pain in both of his lower extremities; and (3) Dr. Bernardi's and Dr. Coyle's findings and conclusions were consistent. Claimant contends these findings by the Commission were not supported by sufficient competent evidence to warrant reducing the ALJ's award to only five percent permanent partial disability because the weight of the objective evidence demonstrated Claimant suffered radiculopathy and an acute injury stemming from the 2009 work accident.

The Commission found the objective evidence did not show an identifiable source of the radicular symptoms into the legs of which Claimant complained. The Commission supported this finding by reasoning that neither Dr. Coyle nor Dr. Cantrell used the term "acute" to describe Claimant's injury and that no doctor identified a specific condition from the imaging studies which could directly be traced to the 2009 work accident as the prevailing factor. Then, the Commission found Drs. Bernardi, Coyle, and Cantrell consistently concluded the "majority" of Claimant's symptoms are from degenerative and congenital conditions and that their opinions were more persuasive than the opinion of Dr. Musich. The Commission criticized Dr. Musich's opinion that all Claimant's back pain is attributable to the 2009 work accident as having been reached "without giving due consideration to the objective medical findings."

In reaching its conclusion, the Commission noted Dr. Cantrell initially rated Claimant's disability in July 2009 at eight percent of the body as a whole referable to his low back, with

23

one-half attributable to the work injury and one-half attributable to preexisting degenerative and congenital conditions unrelated to the 2009 work accident. The Commission also noted Dr. Cantrell's final opinion, expressed in letters to Dr. Coyle and Employer's attorney in June 2011, was that none of the objective evidence showed Claimant suffered acute trauma because of the 2009 work accident.

Because the Commission concluded the objective findings did not show Claimant suffered an acute injury at the time of the 2009 work accident, it found Claimant's continuing reports of pain well after treatment had ended and maximum medical improvement was attained supported the conclusion that "his pain (at least in part) is derived from a degenerative or congenital condition." The Commission also noted Claimant's June 2009 functional capacity evaluation found him capable of returning to work with limitations. The Commission concluded Mr. England's vocational rehabilitation evaluation, which found Claimant capable of returning to the open labor market, more persuasive than Mr. Weimholt's. The Commission found that radiculopathy was not identified in the objective findings until "long after the March 9, 2009 workplace event."

We find the Commission's determination that Claimant has not proven permanent total disability is supported by sufficient competent evidence. Sufficient competent evidence is "evidence which has probative force on the issues and from which the trier of facts can reasonably decide the case." *Morris v. Glenridge Children's Ctr., Inc.*, 436 S.W.3d 732, 735 (Mo. App. E.D. 2014) (quoting *Miller v. Great S. Bank*, 367 S.W.3d 111, 118 (Mo. App. S.D. 2012)). Sufficient competent evidence is a minimum threshold: "The testimony of one witness, even if contradicted by the testimony of other witnesses, may be sufficient competent evidence

to support an administrative decision." *Thompson v. Treasurer of Missouri*, 545 S.W.3d 890, 893 (Mo. App. E.D. 2018) (citing *Morris*, 436 S.W.3d at 735).

The Commission determined Claimant failed to prove permanent total disability because Claimant's functional capacity evaluation found him capable of returning to work with limitations. It also considered Dr. Musich's opinion of Claimant's level of disability, which depended on a vocational rehabilitation counselor's ability to place Claimant in an appropriate job setting. The Commission acknowledged there were competing vocational rehabilitation expert opinions. Mr. England opined Claimant was not permanently and totally disabled, while Mr. Weimholt opined Claimant was permanently and totally disabled. After considering both opinions, the Commission found Mr. England's opinion "more persuasive" than Mr. Weimholt's opinion. It was within the Commission's right to make such a finding, as acceptance or rejection of evidence is an issue for the Commission to determine. *Houston v. Roadway Express, Inc.*, 133 S.W.3d 173, 179 (Mo. App. S.D. 2004) (internal citation omitted). The Commission's conclusion that Claimant failed to prove permanent total disability rests on evidence from which it could make a reasonable decision.

However, the Commission's finding that the objective evidence failed to show Claimant suffered radiculopathy and an acute injury because of the 2009 work accident and Claimant is therefore only entitled to five percent permanent partial disability is against the overwhelming weight of the evidence. The electrodiagnostic and radiographic findings from March 2009 make it clear Claimant suffered radiculopathy and an acute post-traumatic injury stemming from the 2009 work accident. Dr. Coyle reviewed Claimant's March 2009 MRI and found it showed evidence of a degenerative disc disease at L4-5 and L5-S1 *with* central disc protrusions at both levels and bilateral L5 spondylolysis. After reviewing the March 2009 MRI, Dr. Coyle

25

diagnosed Claimant with lumbar disc herniations. On May 20, 2009, Dr. Coyle made positive findings of dysesthesias into the anterior thighs and calves plus diffuse tingling in both of Claimant's feet. On that same date, Dr. Coyle reviewed Claimant's March 2009 MRI again, this time concluding "[h]e has a central disc prolapse at L4-5."

Dr. Musich also concluded Claimant had a central disc protrusion present at L5-S1. Dr. Cantrell similarly found Claimant's March 2009 MRI "revealed a central and paracentral disc protrusion at the L5-S1 level that appeared to result in some compression of the descending S1 nerve root." He also found Claimant's July 2009 lumbar myelogram and post-myelogram CT scan "revealed evidence of spondylolisthesis of L5 on S1, along with circumferential disc bulge and a small central disc protrusion at the L3-4 level, with degenerative disc bulge at L3-4 and L4-5." Both Dr. Coyle and Dr. Cantrell found the September 2010 EMG study's results showed evidence of S1 radiculopathy. Dr. Coyle found the October 2010 MRI scan showed "mild dessication at L4 and L5 with annular tears at each level, L4-L5 as generalized bulging with focal and central and right paracentral disc protrusion with the same finding at L5-S1, with the addition of an annular tear." In addition, all doctors agreed there are no records showing Claimant experienced any back pain before the 2009 work accident.

On cross-examination, Dr. Bernardi admitted that disk herniations are, by definition, acute. Dr. Bernardi also admitted that, in in the younger population, disk herniations and acute disk prolapses are the most common cause of radiculopathy and that it is less than five percent likely that a thirty-year-old person, like Claimant, would experience radicular pain caused by degenerative disc disease. Despite these admissions and despite Dr. Coyle's and Dr. Cantrell's treatment notes and observations, Dr. Bernardi concluded there were no acute abnormalities present on Claimant's imaging studies. Dr. Bernardi conceded there were no records in evidence

26

suggesting Claimant experienced back pain before March 9, 2009. While he acknowledged Claimant's history of never having back pain before the 2009 work accident suggested the 2009 work accident was the prevailing cause of Claimant's pain, he nevertheless concluded the underlying cause of the pain was not clearly identifiable from the objective evidence available. Although he did not have a medical explanation for Claimant's back pain, Dr. Bernardi concluded Claimant's September 2010 EMG study's results showed "*chronic* S1 radiculopathy," a year and a half after Claimant sustained his work injury. (emphasis added).

After reviewing the lumbar myelogram and post-myelogram CT scan in July 2009, Dr. Cantrell rated Claimant's permanent partial disability at eight percent of the body as a whole referable to his low back, with one-half attributable to his work injury and one-half attributable to his preexisting degenerative and congenital abnormalities unrelated to his work injury.[18] Then, in letters to Dr. Coyle and Employer's attorney in June 2011, Dr. Cantrell changed his opinion, concluding that none of the objective evidence showed Claimant suffered acute trauma because of the 2009 work accident. According to the Commission, Dr. Cantrell's sudden change in opinion resulted from his "review of additional medical records in which [Claimant] had sought medication for pain from other providers, after his last visit with Dr. Cantrell." No explanation of how these additional records influenced Dr. Cantrell's opinion is provided in either Dr. Cantrell's June 2011 letter or in the Commission's decision.

---

[18] Employer was asked at oral argument what sufficient competent evidence supported Dr. Cantrell's conclusion that Claimant's preexisting degenerative condition was "disabling" when the record is devoid of evidence regarding prior low back injury, prior treatment for a low back condition, prior complaints of low back pain, or any prior lost time from work or activity limitations attributable to the low back. Employer did not identify any such substantial competent evidence in response. In § 287.190.3, the legislature defines unscheduled permanent partial disabilities as those injuries causing "loss of use" and "loss of earning power." While not essential to our conclusions and holdings herein, we fail to see any support in the record for Dr. Cantrell's opinion Claimant had preexisting disability.

In his letter to Employer's attorney, Dr. Cantrell stated the September 2010 EMG study revealed findings consistent with "*chronic* bilateral S1 radiculopathy in the absence of any L4 or L5 denervation and the absence of any peripheral polyneuropathy." (emphasis added). He did not describe the results of the September 2010 EMG study as "chronic" before June 17, 2011; he initially described the results of the September 2010 EMG study as revealing "abnormalities of fibrillations and polyphasic motor unit potentials in the left gastrocnemius and polyphasic motor unit potentials in the right gastrocnemius, both of which are supplied by the S1 nerve root." This evidence, plus the total absence of evidence that Claimant suffered any preexisting low back injury, experienced any symptoms of back pain, or underwent any treatment for back pain before March 9, 2009, overcomes the Commission's finding that Claimant suffered no acute injury or radiculopathy related to the 2009 work accident.

We are further troubled by the Commission's finding that Dr. Coyle's opinions are consistent with Dr. Bernardi's opinions. We find such a determination supports our holding that the Commission's legal conclusion that Claimant suffered five percent permanent partial disability is against the overwhelming weight of the evidence. Dr. Coyle and Dr. Bernardi disagree on several points within the record. During Claimant's initial visit with Dr. Coyle in March 2009, Dr. Coyle diagnosed lumbar herniations. However, during his deposition, Dr. Bernardi stated he did not believe Claimant had herniations and instead diagnosed him with a lumbar strain or sprain that should have resolved within four to six weeks. While Dr. Coyle repeatedly noted the objective evidence showed Claimant suffered from radiculopathy, Dr. Bernardi found no radiculopathy. Further, Dr. Coyle identified a disc prolapse at L4-5 in Claimant's March 2009 MRI. Although Dr. Bernardi agreed acute disc prolapses are the most common cause of radiculopathy, he found neither present in Claimant's scans.

Generally, "[w]e defer to the Commission's findings as to weight and credibility of testimony and are bound by its factual determinations." *ABB Power T&D Co. v. Kemper*, 236 S.W.3d 43, 49 (Mo. App. W.D. 2007) (quoting *Higgins v. Quaker Oats Co.*, 183 S.W.3d 264, 271 (Mo. App. W.D. 2005)). However, the evidence that Claimant suffered radiculopathy and an acute injury because of the 2009 work accident is overwhelming on the record before us. The extent and percentage of a claimant's disability must be determined after considering all the evidence and all the reasonable inferences from that evidence. *Fogelsong v. Banquet Foods Corp.*, 526 S.W.2d 886, 892 (Mo. App. 1975). When, after considering all the evidence, this Court determines the disability rating made by the Commission is not supported by sufficient competent evidence, this Court may modify the rating. *See* § 287.495.1; *Blair v. Assoc. Wholesale Grocers, Inc.*, 593 S.W.2d 650, 655 (Mo. App. S.D. 1980), overruled on other grounds by *Hampton*, 121 S.W.3d 220.

As explained in the preceding paragraphs, there is an overpowering amount of contrary objective evidence suggesting Claimant suffered radiculopathy and an acute injury because of the 2009 work accident. That Dr. Coyle and Dr. Cantrell never used the precise term "acute" to describe Claimant's injury does not convince us otherwise. Further, we find that, given the entire record, the Commission could not have reasonably found that Dr. Coyle's opinions are consistent with Dr. Bernardi's opinions. The evidence before the Commission does not reasonably support its conclusion that no objective evidence showed Claimant suffered an acute injury and radiculopathy. This Court holds, based on the evidence, the permanent partial disability rating of five percent of the body as a whole referable to Claimant's low back as made by the Commission is not supported by sufficient competent evidence and the rating should be

increased to twenty percent.[19]   Accordingly, the Commission's rating of permanent partial disability is reversed and modified.

*Future Medical Treatment*

As part of his first point relied on, Claimant seems to argue the Commission erred in denying Claimant future medical treatment related to his back injury and depression.  In its decision, the Commission both (1) limited Claimant's recovery to five percent permanent partial disability and (2) denied Claimant relief for future medical treatment.  However, it is unclear from Claimant's argument whether he challenges the award's reduction of his level of disability to five percent or the award's denial of future medical treatment.  This Court will not speculate on arguments not made because "to do so would cast the court in the role of an advocate for the appellant." *Martin v. Div. of Emp't Sec.*, 384 S.W.3d 378, 384 (Mo. App. E.D. 2012) (citing *Hankins v. Reliance Auto., Inc.*, 312 S.W.3d 491, 494 (Mo. App. E.D. 2010) (internal quotations omitted)).  To the extent Claimant intended to challenge the Commission's denial of future medical treatment in his first point relied on, we find he violated Rule 84.04 by joining his contention with his discussion of permanent total disability rather than stating it in a separate point. MO. SUP. CT. R. 84.04(e).  *See DeWalt v. Davidson Serv./Air, Inc.*, 398 S.W.3d 491, 502 (Mo. App. E.D. 2013).  Improper points relied on, including multifarious points, preserve nothing for appellate review. *Martin v. Reed*, 147 S.W.3d 860, 863 (Mo. App. S.D. 2004).

We further note Claimant, on future medical treatment, fails to follow the four-step sequence for challenging the Commission's award as against the overwhelming weight of the evidence as announced in *Jordan*.  *See Jordan v. USF Holland Motor Freight, Inc.*, 383 S.W.3d 93, 95 (Mo. App. S.D. 2012).  At no point does Claimant clearly identify any factual proposition

---

[19] The parties stipulated to the rate of $330.97 for permanent partial disability.  Twenty percent of the body as a whole is $26,477.60 (.20 x 400 = 80; 80 x 330.97 = 26,477.60).

30

necessary to support the Commission's award relating to future medical benefits, marshal any evidence, and prove that any evidence supporting the Commission's award is so non-probative that no reasonable mind could believe the result the Commission reached. Adherence to this framework is mandatory—the "absence of any such criteria, even without a court-formulated sequence, dooms an appellant's challenge." *Robinson v. Loxcreen Co., Inc.*, 571 S.W.3d 247, 251 (Mo. App. S.D. 2019) (internal quotation omitted). Therefore, both because Claimant failed to properly present this argument in his point relied on and because Claimant failed to follow the four-step sequence outlined in *Jordan*, any possible challenge to the Commission's denial of future medical treatment fails.

However, had Claimant properly raised this issue on appeal, sufficient competent evidence exists in the record to support the Commission's decision denying Claimant future medical treatment. Once a compensable injury is found, § 287.140.1 provides an employer must provide such care "as may reasonably be required after the injury or disability, to cure and relieve from the effects of the injury," including the cost of future medical treatment. § 287.140.1; *Tillotson v. St. Joseph Med. Ctr.*, 347 S.W.3d 511, 518 (Mo. App. W.D. 2011). An employer may not be ordered to provide future medical treatment for non-work related injuries. *Bowers v. Hiland Dairy Co.*, 132 S.W.3d 260, 270 (Mo. App. S.D. 2004). An employer is responsible for future medical benefits only if the claimant establishes there is a "reasonable probability that, because of [his or] her work-related injury, future medical treatment will be necessary." *Tillotson*, 347 S.W.3d at 524-25 (quoting *Stevens v. Citizens Mem'l Healthcare Found.*, 244 S.W.3d 234, 237 (Mo. App. S.D. 2008)).

The Commission found Claimant failed to prove he is entitled to future medical treatment for either his back injury or depression. The Commission noted no future medical treatment was

ordered to treat Claimant's depression because he did not prove his depression resulted from the 2009 work accident.[20] The Commission found credible and adopted the findings of Drs. Cantrell, Bernardi, and Wolfgram. Dr. Cantrell opined the pain medications prescribed to Claimant were for treatment of degenerative conditions rather than any acute or chronic residual pain resulting from the 2009 work accident. Dr. Bernardi opined that Claimant required no pain medications. Dr. Wolfgram opined there was "no basis" for Claimant to take pain medication, as pain medications that elevate mood should only treat injuries for a short period because they "are highly addicting and dangerous to use for any chronic conditions." The Commission also found neither Dr. Coyle nor Dr. Cantrell stated Claimant will need additional medical treatment due to his back injury resulting from the 2009 work accident and Dr. Musich did not prescribe or recommend medication. This Court defers to the Commission's factual findings and credibility determinations unless they are not supported by sufficient competent evidence. *McDowell v. Missouri Dep't of Transp.*, 529 S.W.3d 898, 901, 905 (Mo. App. E.D. 2017); *Coday v. Div. of Employment Sec.*, 423 S.W.3d 775, 778 (Mo. banc 2014). The Commission's denial of future medical treatment is clearly supported by sufficient competent evidence. Accordingly, we find the Commission did not err.

## Point II

In his second point relied on, Claimant asserts "the Commission erred in reducing the ALJ's award because it applied the incorrect legal standard when it ignored and rejected Missouri authority recognizing an aggravation of a pre-existing but non-disabling condition can be compensable if a job-related injury escalates the condition to a disability."

---

[20] We note Claimant did not advance any arguments in his first point relied on challenging the Commission's finding that the 2009 work accident was not the prevailing factor in causing Claimant's depression. Further, Claimant specifically waived the issue at oral argument.

*Medical Causation*

To support his award of permanent total disability, the ALJ cited *Weinbauer v. Grey Eagle Distributors*, 661 S.W.2d 652, 654 (Mo. App. E.D. 1983) for the principle that "[a]n inherent weakness or bodily defect, such as spondylolisthesis, occurring in conjunction with an abnormal strain . . . will support a claim for compensation." On review, the Commission noted *Weinbauer* was decided before the 2005 amendments to § 287.020 and it did not rely on *Weinbauer* as the ALJ did. The Commission declined to follow *Weinbauer*, asserting, after the 2005 amendments, § 287.020.2 states a condition is not compensable if work was merely a precipitating or triggering factor. According to the Commission, given the 2005 amendments, Claimant's 2009 work accident could be the prevailing factor causing him to suffer only a chronic back sprain or strain.

Claimant argues it is settled law—under both pre-2005 and post-2005 workers' compensation law—that a claimant can be compensated when a work injury aggravates an asymptomatic, preexisting condition, provided the requisite statutory standard of causation is met. Claimant maintains the Commission's reduction of the ALJ's award from permanent total disability to only five percent permanent partial disability on that basis was erroneous.

It should first be noted that the requirement that a condition is not compensable if work was merely a precipitating or triggering factor is longstanding and predates the 2005 amendments. *See* § 287.020.2 RSMo (1993) ("An injury is not compensable merely because work was a triggering or precipitating factor."); *see also* § 287.020.2 RSMo (2005) ("An injury is not compensable because work was a triggering or precipitating factor."). Therefore, the Commission's statement that the 2005 amendments changed the law regarding whether work may be a precipitating or triggering factor in causing a condition is incorrect.

33

We further find the Commission's statement insinuating *Weinbauer* is no longer good law exceeds the scope of its authority. "[A]n administrative tribunal is a creature of statute and exercises only that authority invested by legislative enactment." *Thomas v. Treasurer of State of Missouri-Custodian of Second Injury Fund*, 326 S.W.3d 876, 879 (Mo. App. W.D. 2010) (quoting *Farmer v. Barlow Truck Lines, Inc.*, 979 S.W.2d 169, 170 (Mo. banc 1998)). The extent of the statutory authority afforded the Commission is described in § 286.060. *State ex rel. ISP Minerals, Inc. v. Labor & Indus. Relations Comm'n*, 465 S.W.3d 471, 473 (Mo. banc 2015). Section 286.060.1(3) provides "[i]t shall be the duty of the labor and industrial relations commission, and it shall have power, jurisdiction and authority . . . [t]o have all powers, duties and responsibilities conferred or imposed upon it by the workers' compensation law (chapter 287) . . . ." It is true the Commission "may exercise quasi-judicial powers that are incidental and necessary to the proper discharge of their administrative functions, even though by doing so they at times determine questions of a purely legal nature.'" *Wilkendon P'ship v. St. Louis Cty. Bd. of Equalization*, 497 S.W.3d 873, 878 (Mo. App. E.D. 2016) (quoting *State Tax Comm'n v. Admin. Hearing Comm'n*, 641 S.W.2d 69, 75 (Mo. banc 1982)). However, just as our Court cannot ignore precedent created by the Supreme Court of Missouri or the Supreme Court of the United States in reaching our decisions, the Commission cannot ignore precedent created by our Court in reaching its decisions. *See Chavez v. Cedar Fair, LP*, 450 S.W.3d 291, 298 (Mo. banc 2014) (internal quotations omitted) ("It is the duty of all inferior courts . . . to follow the decision of the Supreme Court en banc."); *Kraus v. Bd. of Ed. of City of Jennings*, 492 S.W.2d 783, 784-85 (Mo. 1973) (internal quotations omitted) ("State court judges in Missouri are bound by the 'supreme law of the land,' as declared by the Supreme Court of the United States . . . . The Supreme Court of the United States has appellate jurisdiction over federal questions arising either in state or

federal proceedings, and by reason of the supremacy clause the decisions of that court on national law have binding effect on all lower courts whether state or federal.").

Missouri courts have long held a claimant can be compensated when a work injury aggravates a preexisting condition to the level of disability, provided he or she proves the requisite statutory standard of causation.[21] *See Miller v. Wefelmeyer*, 890 S.W.2d 372, 376 (Mo. App. E.D. 1994), overruled on other grounds by *Hampton*, 121 S.W.3d 220; *George v. City of St. Louis*, 162 S.W.3d 26, 32 (Mo. App. E.D. 2005). The aggravation of a preexisting condition or its symptoms may constitute a sufficient change in pathology to qualify for compensation, even though workers' compensation law requires more than a simple aggravation of a preexisting condition. *See George*, 162 S.W.3d at 32; *Winsor v. Lee Johnson Const. Co.*, 950 S.W.2d 504, 509 (Mo. App. W.D. 1997), overruled on other grounds by *Hampton*, 121 S.W.3d 220; *Randolph Cty. v. Moore-Ransdell*, 446 S.W.3d 699, 710 (Mo. App. W.D. 2014).

Several cases applying post-2005 law have reached a similar holding. *See Dierks v. Kraft Foods*, 471 S.W.3d 726, 734 (Mo. App. W.D. 2015) ("It is well-established law that a preexisting but non-disabling condition does not bar recovery of compensation if a job-related injury causes the condition to escalate to the level of disability"); *Maness v. City of De Soto*, 421 S.W.3d 532, 540 (Mo. App. E.D. 2014) (finding the Commission's conclusion that "the work accident was the prevailing factor causing the resulting [disc herniation], as well as the aggravation of the underlying and previously asymptomatic degenerative disc disease and degenerative joint disease at C4-5 and C5-6" was supported by sufficient competent evidence).

---

[21] Prior to the 2005 amendments to workers' compensation law, a claimant needed to prove only that the work accident was "a substantial factor" in causing the resulting medical condition and disability. § 287.020.3(1) RSMo (1993). After the 2005 amendments took effect, a claimant must prove that the work accident was "the prevailing factor" in causing the resulting medical condition and disability. § 287.020.3(1) (2005); *Miller v. Missouri Highway & Transp. Comm'n*, 287 S.W.3d 671, 673 (Mo. banc 2009). "'The prevailing factor' is defined to be the primary factor, in relation to any other factor, causing both the resulting medical condition and disability." § 287.020.3(1).

Thus, a work accident may be the prevailing factor in causing an injury sustained due to the aggravation of preexisting, asymptomatic degenerative condition. It was error for the Commission to find to the contrary.

## Conclusion

Viewing the award objectively and examining the evidence in the context of the whole record, we affirm the Commission's award as to the finding that Claimant is not entitled to future medical treatment. Similarly, we affirm the Commission's finding that Claimant is not permanently and totally disabled. Because we find the Commission's award determining medical causation and rating Claimant as suffering five percent permanent partial disability is not supported by sufficient competent evidence, as it is against the overwhelming weight of the evidence, we reverse the Commission's award as to those findings and modify the Commission's rating of disability to twenty percent.

_____
Philip M. Hess, Presiding Judge

Kurt S. Odenwald, J. and
Lisa P. Page, J. concur.

36